OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1913.

(Continued from Volume 254.)

BRITISH-AMERICAN PORTLAND CEMENT
COMPANY v. CITIZENS GAS COMPANY and
J. E. CAMPBELL, Appellants.

In Banc, February 10, 1914.

1. FORFEIT: Deposit on Purchase: Unexecuted Contract: In
Sole Possession of Stakeholder. Where the proposed con-
tract for the purchase of natural gas lands was never exe-
cuted, money put up by the vendee company with a stakeholder
cannot be recovered from the vendor company, if it never
passed into its hands, but remained until suit was brought
in the stakeholder's possession.

2. FOREIGN CORPORATION: Right to Sue in This State: Un-
constitutional Statute. Section 3040, Revised Statutes 1909,
providing that no foreign corporation which has failed to com-
ply with the laws of this State requiring it to obtain a license
to do business in this State, "can maintain any suit or action,
either legal or equitable, in any of the courts of this State,
upon any demand, whether arising out of contract or tort," if
it was meant to close the doors of the courts of this State to a
citizen of another State, to enforce a right growing out of a
business transaction carried on in this State, is unconstitu-

tional. If that is its meaning and purpose, it is violative of section 10 of article 2 of the Constitution of Missouri, declaring that "the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character," and of section 30 of the same article, declaring that "no person shall be deprived of life, liberty or property without due process of law," and of section 2 of article 4 of the Constitution of the United States, declaring that "citizens of each State shall be entitled to all privileges and immunities of citizens of the several States," and of section 1 of the Fourteenth Amendment to said Constitution, declaring, among other things, that "no State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law." So that a West Virginia corporation, whose principal business office was in this State, which, without having been licensed to do business in this State, attempted in this State to enter into a contract with an Oklahoma corporation for the purchase of certain natural gas properties in Oklahoma, and placed ten thousand dollars in the hands of an Oklahoma banker, to be turned over to said Oklahoma corporation upon certain conditions, may maintain suit in this State for the return of said money, against said banker, when he is found in the county in which the suit is brought and the said corporation has its business office.

Held, by BROWN, J., dissenting, with whom GRAVES, and WALKER, JJ., concur, that a foreign corporation whose principal business office is in this State cannot carry out its incorporated power "to buy, sell and otherwise handle and deal in coal, gas and other minerals and mineral products" and "to acquire, own, lease, occupy, use, mine, hold and develop lands for the purpose of producing all or any of said substances," by entering into a contract in this State to buy natural gas pipe lines in Oklahoma, without procuring a license to do business in this State; that such a transaction, whether with citizens of this or another State, is transacting business within this State, and is carrying out the very purposes for which the corporation was organized; that such business is not interstate commerce; that the law requiring such a corporation to procure a license imposes upon it only the same burden it places upon domestic corporations; and that the statute which prohibits such a corporation to sue in the courts of this State to enforce a right growing out of such business, is peculiarly equitable, and is not unconstitutional.

Held, by WALKER, J., dissenting, with whom GRAVES and BROWN, JJ., concur, that such foreign corporation has no legal entity or existence in Missouri, and consequently its

contracts are invalid and unenforceable in Missouri courts; that a corporation which has been created elsewhere cannot establish itself within this State, transact business here, enter into contracts and enforce them in the State courts in defiance of express statutes; and that the statutes prescribing the terms upon which such purely artificial entities may be admitted to the State are not in contravention of either the State or Federal Constitution.

3. ———: ———: ———: **Right to Sue: Merits of Claim: Difference.** There is a broad distinction between the right of a corporation to institute and prosecute a suit in the courts of this State, and its rights to recover upon the merits thereof after a hearing. A citizen of another State has the same right to sue in the courts of this State that a citizen of this State has; and that is a constitutional right, which a statute cannot take away. [BROWN, WALKER and GRAVES, JJ., dissenting.]

4. **STAKEHOLDER: Unexecuted or Void Contract: Recovery.** If a contract, attempted to be executed between two corporations for the purpose of buying gas land in Oklahoma, is null and void under the laws of that State prohibiting a foreign corporation formed for the purpose of transporting natural gas' by means of pipe lines from conducting business within that State, then the title to ten thousand dollars put up by the vendee in the hands of a banker for the use of the vendor when the proposed contract should be executed, never passed from the vendee to the said banker the stakeholder. or to the vendor. And the same is true if the contract was never executed.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover*, Judge.

AFFIRMED AS TO CAMPBELL; REVERSED AS TO GAS COMPANY.

*Gerson B. Silverman* and *Eugene B. Lawson* for appellants.

(1) One of the defendants, Citizens Gas Company, is a foreign corporation, organized under the laws of Oklahoma, and doing business at Nowata, Oklahoma. The defendant corporation was lawfully served with process so as to give the court jurisdiction of such defendant. R. S. 1909, secs. 570, 995, 997; Newcomb v. Railroad, 182 Mo. 687; Painter v.

Railroad, 127 Mo. App. 248; U. S. v. Telephone Co., 29 Fed. 37. (2) The plaintiff corporation was and is a foreign corporation doing business in the State of Missouri without a license, and as such, under Sec. 1026, R. S. 1899, it cannot maintain this suit. The subject of this controversy is on a demand arising out of contract. The statute is very plain: "No foreign corporation which shall fail to comply with this act can maintain any suit or action, either legal or equitable, in any of the courts of this State, upon any demand arising out of contract or tort." Williams v. Sculler, 59 Mo. App. 30; Steam Co. v. Gas Fixture Co., 60 Mo. App. 148; Machine Co. v. Ramlose, 210 Mo. 650. The purpose of the prohibitory statute was to make the foreign corporation which comes to Missouri establish an office, bear the same burdens and be regulated by the same laws as domestic corporations, regardless of whether it did part of its business with the citizens of the State, or part of its business with the citizens of other States. Heating Co. v. Gas Fixture Co., 60 Mo. App. 148; Buggy Co. v. Priebe, 123 Mo. App. 521; Amusement Co. v. Amusement Co., 192 Mo. 404. The very cause of action brought by the plaintiff is void, and the court should have allowed the evidence introduced as offered by the defendants, and then at the close of the whole sustained the demurrer offered by the defendants. Buggy Co. v. Priebe, 123 Mo. App. 521.

*John E. Dolman* for respondent.

Though a foreign corporation, which had not obtained a license to do business in this State, respondent can maintain this action for money wrongfully obtained from it by appellants. There is no law of this State which denies or is intended to deny the right of two foreign corporations to come into this State for the purpose of making a contract which is to be performed in another State. It is not the mak-

ing of a contract that the statute prohibits, but the doing of business in this State with citizens of this State that is prohibited. Amusement Co. v. Amusement Co., 192 Mo. 417. Any citizen of the United States, or of any State thereof, may sue in the courts of any other State, wherever a citizen of such State may do so under the laws thereof, provided legal service can be had on the defendant, despite any statute of the State to the contrary. State ex rel. v. Grimm, 239 Mo. 182; Textbook Co. v. Pigg, 217 U. S. 91; Chambers v. Railroad, 207 U. S. 142-148; Machinery Co. v. Ramlose, 210 Mo. 631, 231 Mo. 508; Roeder v. Robertson, 202 Mo. 522.

WOODSON, J.—This suit was instituted in the circuit court of Jackson county, by the plaintiff against the defendants, to recover the sum of $10,000 placed by the latter in the hands of J. E. Campbell, as earnest money, for the proposed purchase, by the plaintiff from defendant company, of certain oil and gas lands, including buildings and improvements thereon, situated in the Indian Territory, now the State of Oklahoma.

The sufficiency of the pleadings is not questioned, and for that reason I put them aside with the passing remark that they properly presented the propositions now before the court.

The facts of the case are substantially as follows:

The plaintiff was a foreign corporation, organized and existing under the laws of West Virginia, with its principal office in Kansas City, Missouri.

The defendant company was also a foreign corporation organized and doing business in the Indian Territory, now the State of Oklahoma.

Neither of said companies had complied with the laws of this State regarding their duties to take out a license to do business herein, or to pay the license

fees for that privilege; and in passing it may not be out. of place to here state that practically all of the business of the Cement Company had been transacted in this State, except what this statement shows was conducted in the Indian Territory or in the State of Oklahoma.

And it might here be added that the Cement Company had not gotten in shape to conduct the real purposes for which it was incorporated, and had sold only about $100,000 worth of its stock, the authorized capital of which was $3,750,000. It had not begun the construction of its plant in Oklahoma, and had not begun to manufacture or sell cement or to pipe oil or gas, and was not organized to the extent that it could do any of the business named in its charter, and at the time of the transaction in question was simply negotiating with the Gas Company, another foreign corporation, for the purchase of the necessary land and pipe lines supplying gas, so as to enable it to begin to do that business, pending which negotiation the latter company succeeded in procuring from the former the $10,000 previously mentioned.

The former company, for convenience, will hereinafter be designated the Cement Company, and the latter the Gas Company.

William Peet was the president of the Cement Company and it was managed and controlled by William Peet, T. J. Coughlin, T. H. Miller and Thomas Harrington.

The president of the Gas Company was J. E. Jones, and if I correctly understand the evidence, he and the defendant Campbell were its managers, and probably later Campbell was its president, but that is immaterial.

The charters of the respective companies duly authorized them to transact the business mentioned in this case.

The general object of the Cement Company was to manufacture and sell cement and kindred products, at its chief works near Nowata, Indian Territory, and to produce and transport oil and gas by means of pipe lines in that territory, with its principal office, as previously stated, in Kansas City, Missouri.

The general purpose of the Gas Company was to produce, sell and transport oil and gas, by means of pipe lines, and to furnish the same to the inhabitants of the town Nowata, and vicinity, for light, heat and manufacturing purposes. Its office and place of business was at Nowata, and J. E. Jones, its president, was a citizen and resident thereof.

The Gas Company had erected and was operating a gas plant, and supplying gas to the citizens of Nowata and vicinity, for the purposes mentioned, at and prior to the times hereinafter mentioned.

In the month of June, 1907, one F. C. Vincent leased and purchased some lands near Nowata, upon which he claimed there were large quantities of cement rock, and with the idea of manufacturing cement therefrom he entered into a temporary contract (the exact nature of which is not clear, and not material here) with the Gas Company by which it was to furnish gas for that purpose. Thereupon he went to Kansas City and St. Joseph and induced some twelve or fifteen of their citizens to organize the Cement Company, which was done August 19, 1907.

In his negotiations with the Kansas City and St. Joseph parties, Vincent, without authority, as I gather it, undertook to assign his contract with the Gas Company to the Cement Company, but be that true or not, it is wholly immaterial in this case, except in that it brought the two companies together regarding the transactions involved in this case.

On June 8, 1908, Jones, the president of the Gas Company, appeared before the board of directors of the Cement Company, then in session at Kansas City,

with a view of having some guaranty put up for the performance of the contract made the previous year by and between Vincent and the Gas Company, to furnish him gas for the purposes previously mentioned, and informed the board that he wanted a permanent and final contract made regarding that matter. The board refused to put up the guaranty or to enter into the contract demanded by Jones, and adjourned the meeting.

After the adjournment some of the directors being importuned further by Jones, retired to the Baltimore Hotel, some distance from the office of the Cement Company, and entered into the following written agreement:

Kansas City, Mo., June 8, 1908.

Memorandum of proposed agreement to be entered into between the Citizens Gas Company of Nowata, Oklahoma, and the British-American Portland Cement Company of West Virginia, represented by Wm. Peet, T. J. Coughlin, T. H. Miller, Tom Herrington.

Mr. Jones of the Citizens Gas Company agrees to sell to said British-American Portland Cement Company his contract with R. L. Henry of Chicago, Ill., for the furnishing of gas for domestic and manufacturing purposes to the town of Nowata, Oklahoma, and vicinity; also the pipe line extending from what is known as the Hogshutter field in Oklahoma to the town of Nowata, for the sum of forty-five thousand dollars, reserving to himself the franchise to deliver gas to the town of Nowata, for domestic purposes only, for which he agrees to pay the Cement Company three cents per one thousand cubic feet delivered at Nowata, Oklahoma.

The British-American Portland Cement Company is to pay the above $45,000 as follows: ten thousand dollars cash upon signing the contract, and ten thousand dollars cash six months from the date of signing the contract, and to issue to Mr. Jones 2500 shares of the preferred stock and 2500 shares of the common stocks of the British-American Portland Cement Company at par value ($10 each). The Cement Company assuming the payment of $45,000 par value of bonds of the Citizens Gas Company.

*The directors agree to use their best efforts to consummate the above agreement.*

The above contract to be entered into not later than June 20, 1908.

T. J. COUGHLIN,
WM. PEET,
TOM HERRINGTON,
T. H. MILLER,
THE CITIZENS GAS COMPANY,
By J. E. JONES (Pres.).

(The italics are ours.)

Thereafter, on June 20, 1908, a directors' meeting of the Cement Company was held in Kansas City, to consider the proposition made on June 8, 1908 (it having been presented to the board in the meantime), and after due consideration the following order was made and entered of record, to-wit:

Whereupon Mr. Courtney moved and Mr. Couglin seconded that the proposition of Mr. Jones for the purchase of the gas contract and pipe line from his company be accepted, provided a suitable contract therefor could be agreed upon, and the general counsel was ordered to prepare such contract and submit to the Citizens Gas Company for approval, which, when approved by both parties, the president is hereby authorized to execute.

Pursuant to said instructions the general counsel for plaintiff immediately prepared a form of contract and submitted it to the counsel for the Citizens Gas Company, as follows:

This Agreement, made and entered into this ——— day of June, 1908, between the Citizens Gas Company, a corporation, organized under the laws of the State of Oklahoma and doing business at Nowata, Oklahoma, party of the first part, and the British-American Portland Cement Company, a corporation of the State of West Virginia, and doing business at Nowata, Oklahoma, party of the second part, witnesseth: For and in consideration of the sum of forty-five thousand dollars and the mutual covenants and agreements hereinafter set forth, it is agreed between the parties hereto as follows:

First—The party of the first part hereby sells, conveys, transfers, and assigns unto the said second party, its successors and assigns, all of the following described pipe, land and property, to-wit:

[Here follows a description of property, including Henry lease.]

Second—The said sum of forty-five thousand dollars shall be payable as follows: Ten thousand dollars upon the signing of this contract, the receipt whereof is hereby acknowledged, ten thousand dollars on or before six months from the date hereof, and. the balance of said sum to be paid in the stock of said second party, to consist of twenty-five hundred shares of the preferred and twenty-five hundred shares of the common stock of said second party, or to anyone it may designate, upon the execution of this agreement.

Third—It is further agreed between the parties, hereto that said second party shall furnish to the said first party gas in such quantities as may become necessary for domestic purposes only in the city of Nowata for the term of —— years, at the sum and price of three cents per thousand feet, measured by the Westinghouse meter, or other reliable standard gas meter, delivered to the party of the first part at the said city of Nowata, and paid for by it on the first of each and every month after date of this agreement, on bills to be rendered therefor by said second party.

In testimony whereof, the parties hereto have caused this instrument to be executed in duplicate by their respective officers and by authority of their boards of directors this the —— day of June, 1908.

(Unsigned.)

In December, 1907, after the incorporation of the plaintiff, Oklahoma, having become a State, enacted the following statute:

"Foreign corporations formed for the purpose of or engaging in the business of transporting or transmitting natural gas by means of pipe lines shall never be licensed or permitted to conduct such business within this State."

The first knowledge that any member of the Cement Company had of this law was about the 25th day of June, 1908, when respondent's general manager was informed of it by counsel of the Gas Company, Mr. Lawson, at Nowata. Said statute had then just been published.

After the adjournment of the directors' meeting of June 20th, aforesaid, Mr. Jones, president of the Gas Company, Mr. Lawson, the attorney for the Gas Company, and Mr. Campbell, one of the appellants herein, and who held $45,000 of the bonds of the Gas

Company, which he hoped to have paid through this transaction, importuned Mr. Coughlin, the general manager, and Mr. Peet, the president, to put up the $10,000 called for in the proposed contract, to be paid to the Gas Company when a final contract was signed, so that when a contract was finally signed the first payment would be forthcoming. This, these gentlemen agreed to do, and the money was thereupon placed in the hands of Campbell, the president of the First National Bank of Nowata; also of the Gas Company, to turn over to the Gas Company, when a contract should be signed. The action of these officers of the Cement Company was not authorized by the board of directors, and the question of putting up $10,000, as a forfeit or otherwise, according to the testimony of Mr. Campbell, appellant herein, was not discussed at the directors' meeting authorizing the making of a contract; and, further, according to his testimony, it was to be put up on the signing of a contract,, authorized by the board on June 20, 1908.

Thereafter, on June 25, 1908, Mr. Coughlin, general manager of the Cement Company, went to Nowata, Oklahoma, to look after some business for the company, and for the first time learned of the law, hereinbefore referred to, having been passed by the Oklahoma legislature, and was told by Mr. Lawson, attorney for appellant Gas Company, "that the laws of Oklahoma wouldn't allow us to carry out our contract." Before Lawson made this statement, however, Mr. Coughlin had paid the balance, $2000, due on the $10,000 payment, and had asked for a receipt. Campbell then told Lawson to write a receipt, which he did, as follows:

$10,000.                    Nowata, Okla., June 25, 1908.
    Received of T. J. Couglin, general manager of the British-American Portland Cement Company, ten thousand dollars, to be held by me for the Citizens Gas Company until a certain contract for the sale of a lease contract between the Citizens Gas Company and the Henry Oil Company, and certain prop-

erties belonging to the Citizens Gas Company are transferred to the British-American Portland Cement Company.

In the event contract is not entered into on account of failure of the British-American Portland Cement Company to complete said contract, then and in that event the said money shall be turned over and delivered by me to the Citizens Gas Company as a forfeit, but in the event that said contract is entered into said money shall be turned over by me to the Citizens Gas Company as a payment on the purchase price of said gas company and property conveyed to the British-American Portland Cement Company.

Dated Nowata, Okla., this 25th of June, 1908.

J. E. CAMPBELL.

While Coughlin was waiting for the receipt to be written in Lawson's office, the latter handed to the former a copy of the Oklahoma statute previously mentioned, and informed him "that we couldn't go ahead with the contract."

Out of this unexpected turn of affairs, the question, what should be done to meet the situation, naturally arose; both parties apparently, from the record, being desirous of carrying out the original design of the negotiations.

Mr. Jones was present when Coughlin was informed of the existence of the Oklahoma law and when Lawson said to Coughlin "that we couldn't go ahead with the contract."

Regarding that matter Mr. Coughlin was asked: "Q. Was Mr. Jones present at that time? A. Yes, sir, Mr. Jones was present, and he also entered into the conversation. Well, we discussed the best way out of the proposition—how to carry out the thing—and I believe I suggested that we could probably have a holding company within the Cement Company. Mr. Jones said he would refuse to make the contract with a holding company. That he would, also, refuse to complete the contract as agreed upon; that it was contrary to law, and Mr. Lawson said he would advise him to refuse to do so. And I agreed to refer the matter to our counsel and that you folks could fix it up some way to adjust the matter."

Continuing, he testified: That Mr. Jones said the only thing that can be done is to incorporate under the laws of Oklahoma.

Mr. Lawson testified that it was his opinion that the Cement Company should reorganize under the laws of Oklahoma, and for that reason left the name of the company and the state of its incorporation blank in the memorandum he prepared of the contract to be drawn and sent to Mr. Dolman, counsel for the Cement Company, to examine and execute if found to be satisfactory, being the contract which the Gas Company claims the Cement Company agreed to execute at the meeting of its board of directors, held at Kansas City, Missouri, on June 20, 1908, previously mentioned.

At the next meeting of the board of directors of the Cement Company, which was held in Kansas City, on July 20, 1908, a quorum was not present, but, if I correctly understand the record, a majority of the executive committee thereof in such a case had the authority to act; and upon that occasion a majority of the committee was present. Upon that day Mr. Jones, with his attorney Mr. Lawson, and Mr. Campbell, appeared before the committee and insisted upon the execution of the contract drafted by counsel for the Gas Company in pursuance to the resolution of the board of directors of the Cement Company on June 20, 1908, both of which have been previously copied. In reply to that insistence of Mr. Jones, the committee of the Cement Company informed him and his associates that the latter company would not execute said contract because it would be in violation of the statute of Oklahoma, before mentioned.

Thereupon Mr. Lawson, attorney for the Gas Company, served upon said committee the following notice:

The British-American Portland Cement Company, Kansas City, Missouri:

Notice is hereby given you that the Citizens Gas Company, Nowata, Oklahoma, stands ready and willing to carry out the terms of a proposed agreement entered into on the 8th day of

June, 1908, between the Citizens Gas Company and the British-American Portland Cement Company, which agreement or contract was consummated on the 20th day of June, 1908, between the said Citizens Gas Company and the British-American Portland Cement Company, and at said time ten thousand dollars in cash was put up in the hands of J. E. Campbell of Nowata, Oklahoma, by the British-American Portland Cement Company as a forfeit to be paid the said Citizens Gas Company by the British-American Portland Cement Company in the event ·of failure by the British-American Portland Cement Company to complete said contract.

You are further notified that if the contract submitted to J. E. Dolman, attorney for the British-American Portland Cement Company, by Eugene B. Lawson, attorney for the Citizens Gas Company, is not satisfactory in any of its terms, the Citizens Gas Company will confer with the British-American Portland Cement Company, its agents or representatives, in order to make satisfactory contract, and that the Citizens Gas Company stands willing to make a contract in accordance with the terms agreed upon.

You are further notified that, in the event of your failure to complete the proposed contract between the Citizens Gas Company and the British-American Portland Cement Company, we demand the payment to us of the ten thousand dollars forfeit money now in the hands of J. E. Campbell of Nowata, Oklahoma.

You are further notified that upon a refusal by you to authorize or direct said J. E. Campbell to turn over to us the said ten thousand dollars in his hands as forfeit money we will immediately begin suit to recover said money.

Given under our hands this 20th day of July, 1908.

THE CITIZENS GAS COMPANY,
By J. E. JONES,
Its President.

Thereafter, and while the meeting was in session, and while Mr. Jones, president of the Gas Company was before it, seeking on behalf of his company to have the contract of June 20, 1908, executed by the Cement Company, and while carrying on such negotiations for his company, the summons in this case was served upon him, and, also, upon Mr. Campbell, to answer the petition of the Cement Company, the plaintiff in this case, to recover the $10,000 which they had obtained from some of its officers and were seeking to retain

as a forfeit for its refusal to enter into the proposed contract.

In due time a trial was had before the court and a jury, which resulted in a verdict and judgment for the plaintiff, the Cement Company, for the full amount sued for, with interest thereon.

In due time the defendants filed their motions for a new trial and an arrest of judgment, which after due consideration were by the court overruled, and defendants duly excepted, etc., and appealed the cause to this court.

I.  The first ground upon which appellants ask for a reversal of the judgment of the circuit court is, that no legal service was had upon the defendant Gas Company.

Conceding that to be true, which we do not decide, yet that would not justify a reversal of the judgment against the defendant Campbell, the stakeholder, upon whom legal service was unquestionably had; and in so far as the Gas Company is concerned the judgment must be reversed for the obvious reason that the proposed contract between it and the respondent Cement Company was never executed; and therefore it never acquired any interest whatever in or possession of the $10,000 sued for, and consequently it was not liable to respondent for the money the respondent placed in the hands of Campbell, the stakeholder, prior to the time it was paid over by him to the appellant company.  So in either event the judgment, in so far as it affects the Gas Company is concerned, is clearly erroneous. and to that extent should be reversed.

**Forfeit Money: Unexecuted Contract.**

II.  The next insistence of counsel for appellants is that, under the statutes of this State, the respondent,

a foreign corporation, not having complied with the
laps of the State, requiring it to obtain
a license to do business herein, is denied
the right to sue in the courts of the State,
however just or unjust its demand
against it, the Gas Company, may be.

Foreign
Corporation:
Right to Sue
in this State.

This insistence, in my judgment, is in direct con-
flict with the Constitution of this State and that of
the United States, and my reasons for so stating will
follow:

The statutes referred to are sections 3037 to 3041,
Revised Statutes 1909, both inclusive. Those sections
prescribe the terms and conditions upon which for-
eign corporations may do business in this State, and
the penalties for the violation thereof, and the next
to the last section contains this further provision:

"In addition to which penalty, on and after the
going into effect of said sections no foreign corpora-
tion, as above defined, which shall fail to comply with
said sections, can maintain any suit or action, either
legal or equitable, in any of the courts of this State,
upon any demand, whether arising out of contract
or tort."

That clause of the statute just quoted has hereto-
fore been before this court in various forms for con-
sideration, but the constitutionality thereof was never
presented to this court for consideration prior to the
case of Roeder v. Robertson, 202 Mo. 522. Since then,
however, it and similar statutes have been before this
court and the Supreme Court of the United States,
for consideration in quite a number of cases. Among
others are the following: United Shoe Machinery Com-
pany v. Ramlose, 231 Mo. 508; International Textbook
Co. v. Gillespie, 229 Mo. 397; State ex rel. v. Grimm,
239 Mo. 135, l. c. 179 to 184; International Textbook
Co. v. Pigg, 217 U. S. 91; Chambers v. Railroad, 207
U. S. 142-148.

In the Roeder-Robertson case, supra, the plain-
tiff, assignee of a foreign corporation, not authorized
to do business in this State, brought suit against the
defendants to recover the value of a steam engine and
threshing machine sold by the company to defendants
in this State.   The defendants pleaded the clause of
the statute under consideration as a bar to plaintiff's
right to a recovery; and in reply thereto plaintiff
challenged the constitutionality of said statute, both
under the State and Federal constitutions, in that it
deprived plaintiff of his property without due process
of law, for the reason that if the contract of sale of
the machinery was void as claimed by defendants, then
the title thereto never passed from the foreign corpo-
ration, and therefore its assignee, the plaintiff, could
maintain that action and was entitled to a recovery of
the value of the machinery sold by the company to
the defendants.   The evidence in that case showed that
the defendants had traded to plaintiff's assignor as a
part of the consideration for the engine and thresher,
some old machinery which the assignor had long pre-
viously disposed of to third parties.   In reply to this
answer counsel for plaintiff insisted that conceding
all counsel for plaintiff contended for was true, yet
the quoted clause of that section of the statute prohib-
iting the foreign corporation and its assignee from su-
ing in the courts of this State, for the recovery of
the machinery or the value thereof, was unconstitu-
tional, null and void.   In that case this court, without
discussing the proposition, conceded to the plaintiff
and his assignor, a foreign corporation, the right to
sue in the courts of this State, but denied the right
of a recovery on the part of the plaintiff because
neither he nor his assignor could restore the defend-
ants to their *status quo,* but the court thereby clearly
and necessarily held that said section of the statute
did not close the doors of our courts to foreign corpo-

rations or their assignees, but recognized and held that any valid law of the State, or rule of good morals, prohibiting a recovery upon the merits of the case would be strictly enforced in all such cases.

There is a broad distinction, as the adjudications hold, between the right of a person or corporation to institute and prosecute a suit in the courts of this State, and his or its right to a recovery upon the merits thereof after a hearing has been had. In other words, the doors of our courts are ever open to any and all who feel himself or herself or itself aggrieved against any person or corporation of this State; but the right to maintain such suit or rather the right to recover a judgment therein is quite a different proposition. The former is an absolute right guaranteed by the constitutions of the State and the United States, but the latter depends wholly upon the merits of the case and the law governing them.

The right to sue in the courts of this State is guaranteed to every person by both the State and Federal constitutions.

The provisions governing that matter are sections 10 and 30 of article 2 of the Constitution of Missouri, and section 2 of article 4 of the Constitution of the United States, and section 1 of the Fourteenth Amendment of the latter instrument.

Section 10 reads as follows:

"The courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice shall be administered without sale, denial or delay."

Section 30 provides "that no person shall be deprived of life, liberty or property without due process of law."

Said section 2 of article 4 of the Constitution of the United States reads as follows: "The citizens of

each State shall be entitled to all privileges and im-
munities of citizens in the several States.''

And said section 1 of the Fourteenth Amendment
provides: ''All persons born or naturalized in the
United States and subject to the jurisdiction thereof
are citizens of the United States and of the State
wherein they reside. No State shall make or enforce
any law which shall abridge the privileges or immuni-
ties of the citizens of the United States, nor shall any
State deprive any person of life, liberty or property
without due process of law, nor deny to any person
within its jurisdiction the equal protection of the
laws.''

The same question connected with an interstate
commerce question, came before this court in the case
of International Textbook Co. v. Gillespie, 229 Mo.
397. In that case two clear-cut questions were pre-
sented, and while somewhat interdependent, as pre-
sented, yet in no manner did that fact complicate the
rules of law governing each. The interstate commerce
question was material in that case, only in that it
bore upon the question of the validity of the contract
and not the constitutional right to sue in the courts
of a State upon a valid or invalid contract or demand.
In that case the plaintiff was a corporation of Penn-
sylvania and had not taken out a license to do busi-
ness in this State, and the defendant was a resident of
the city of St. Louis, Missouri; the latter agreed with
the former to pay it the sum of $61.20 for a course of
instruction, through what is known as the correspond-
ence system; there was a breach of the contract on
the part of the defendant and the plaintiff sued de-
fendant in a justice's court for said sum. The statute
in question was interposed as a defense, and was upon
appeal by the circuit court sustained and judgment
was accordingly rendered for the defendant. Upon
appeal to this court, as previously stated, two questions
were presented, viz.: Did the contract in question in-

volve interstate commerce; and second, was that clause of section 1026, Revised Statutes 1899, denying to unlicensed foreign corporations the right to sue in the courts of this State (the same being a literal copy of section 3040, Revised Statutes 1909, now under consideration) constitutional? In obedience to the ruling of the Supreme Court of the United States, in the case of the International Textbook Company v. Pigg, 217 U. S. 91, involving an identical contract and a similar statute of Kansas, we answered the first question in the affirmative and the latter in the negative. In discussing the latter, this court, in quoting from the opinion of the Supreme Court of the United States with approval, in substance said:

Although the Textbook Company may have had a valid contract with a citizen of Missouri (which it did), yet the statute in question denies its right to invoke the authority of the courts of this State to enforce its provisions unless it did what the Supreme Court of the United States held it was not, under the Constitution, bound to do, namely, make, deliver and file with the Secretary of State the statement required by said statute. In other words, this court in that case, followed the ruling of the Supreme Court of the United States in the Pigg case and held that said statute did not apply to interstate commerce, and therefore the contract was valid, and being valid, the Legislature of this State was, by the State and Federal constitutions, prohibited from closing the doors of our courts to the plaintiff in that case, even though it had not complied with the statutes of this State prescribing the conditions upon which foreign corporations might do business herein. In short, that court and this held that whenever any person or corporation of another State had a valid (or invalid for that matter) claim, however created against a citizen of this State, or a corporation organized and existing under the laws of Missouri, or duly authorized to do business in this

State, the Legislature had no constitutional authority to close the doors of our courts against such parties, regardless of the fact that they may not have complied with the other provisions of the statutes governing foreign corporations doing business herein. Not only that, even though the claim be involved, the Legislature has no constitutional authority to close the doors of our courts against the party owning and presenting a demand for adjudication, but if invalid for any reason the court would deny a recovery, but would not lend a deaf ear to anyone who implores the assistance of our courts for an investigation of his claims.

Common justice, common honesty and good morals demand that every one should have a hearing in and upon any and all matters involving his or their lives, liberty, property and domestic relations, all of which are guaranteed and firmly protected by both the State and Federal constitutions. Of course, I refer to cases where the person and the subject-matter of the suit are in this State, or the legal representatives thereof are within the jurisdiction of our courts.

What would be the object of those constitutional guaranties and protection, if the Legislature could legally close the doors of our courts and thereby debar any and all inquiry involving those sacred rights? I unhesitatingly insist there would be none.

The framers of our Constitution in their wisdom and foresight clearly foresaw just such a situation as is here presented, and adopted section 10 of article 2 of our Constitution, providing that "the courts of justice shall be open to every person, and certain remedy afforded for every injury to *person, property or character,* and that right and justice shall be administered without sale, denial or delay."

What language could be more comprehensive and sweeping than this? It clearly includes all citizens of the United States, be they natural or artificial persons, because the Constitution of this State recognizes

both, and this court and the Supreme Court of the United States have repeatedly held that corporations are included within the meaning of the word 'citizen' as will be later shown.

Even in the case of Roeder v. Robertson, supra, where it was conceded at the trial, that the contract of sale was absolutely null and void, yet this court entertained the plaintiff's suit for the reasons stated, but denied him a recovery upon the merits of his case. In no other way under the sun, in civilized and constitutional forms of government, can the merits or demerits of a case be ascertained and adjudicated, except in the courts of such government.

The constitutionality of the same statute, now under consideration, was again presented to this court in the case of United Shoe Machinery Company v. Ramlose, 231 Mo. 508, which was a suit in replevin to recover the possession of twenty-six sewing machines, which the plaintiff, a nonresident, unlicensed corporation leased to the defendant, a citizen and resident of this State. Among other defenses interposed by the defendant, was the statute now under consideration. The plaintiff, in that case, as in the case of Roeder v. Robertson, supra, insisted that, if the lease was void under the statute mentioned, then neither the title nor the right to the use or possession of the machines ever passed from plaintiff to the defendant, and consequently the plaintiff was entitled to recover their possession, since defendant refused to pay the rental due thereon and therefore had no right to their possession. In discussing this particular clause of this statute the court said:

"By reading this motion in connection with the record presented to this court, it will be seen that appellant relied, among other things, for a reversal of this judgment, upon the facts that the lease of the machinery mentioned in evidence is valid, and that appellant was duly authorized to do business in this State,

as provided for by sections 1024 and 1026, Revised Statutes 1899. Both these questions were presented to this court upon the former appeal, and after a full and careful consideration, they were decided adversely to the appellant. Notwithstanding that fact, we have, at the earnest solicitation of the counsel for appellant, re-examined both questions, and are fully satisfied the results reached there were proper. We, therefore, decline to interfere with the judgment for either of said reasons.

"In addition to the foregoing propositions, counsel for appellant present upon this appeal the Federal questions before mentioned, which were not, as before stated, presented or passed upon when the case was here upon the previous appeal.

"It is contended that, even though it be conceded, as the court has held, that the lease in question is void, still appellant is entitled to recover the possession of the machines it leased to the respondent, for the reason that it is conceded that appellant is the owner of them; and if the lease is void, then it has both title to, and as an incident thereto, it has the right to the possession of them. Under that state of facts, counsel for appellant contend that a denial of its right to recover the possession of the machines would deprive it of its property without due process of law; denies it the same rights, immunities and privileges that are accorded to the citizens of this State; and denies to it the equal protection of the law; all in violation of the Constitution of the United States.

"If the contract of lease in question is absolutely null and void, as contended for by counsel for respondent, then no right to the use of the twenty-six machines was conveyed or passed by virtue thereof from the appellant to the respondent. Under such circumstances the title remained in the former just as completely as if the lease had never been executed, and consquently respondent has no interest in them or to their use

This is self-evident, and was so held by this court in a number of cases. Those identical Federal questions were presented to Division One of this court in the case of Roeder v. Robertson, 202 Mo. 522, and on page 535, in discussing them, the court used this language:

" 'Appellant asks for a reversal of the judgment because the act which prohibits foreign corporations from doing business in this State until they comply with the provisions thereof is, "in so far as it seeks to make contracts so made with corporations of other States void, before they have complied with the requirements of said act, unconstitutional, because such act seeks to take from such foreign corporations, or nonresident citizens, its or his property without due process of law, and denies to such foreign citizen the same rights, immunities and privileges that are accorded to the citizens of this State, and because it denies to such foreign corporation or citizen the equal protection of the law."

" 'It will be seen that counsel for appellant assails the validity of the act upon three separate and distinct grounds: First, because it seeks to deprive the foreign corporation of its property without due process of law; second, that it denies such corporation the same rights, immunities and privileges that are accorded to the citizens of this State; and, third, it denies to such corporation equal protection of the law.

" 'The learned counsel, it seems to us, wholly misapprehends the meaning and scope of the act. The act is prohibitive in its operation. It seeks to prevent foreign corporations from doing business in this State until they have complied with the provisions of the act by filing a copy of their charter or articles of incorporation with the Secretary of State and by appointing an agent in this State to represent them. If such corporations, in violation of this act, do business in this State, all such transactions are, by the

courts, declared null and void, and all contracts made by them with citizens of this State for the sale of goods, wares and merchandise are nullities, and the title to the property sought to be transferred thereby does not pass to and vest in the vendee, but remains in the vendor, the same as if the pretended contract had not been executed.

" 'It is therefore clearly seen that the act does not violate the constitutional provision which prevents the taking of property without due process of law, because the act does not take the property of a foreign corporation from it, nor does it give it to another, but lets the title thereof remain in and abide with the corporation; and if the corporation had parted with the possession of its property, under the void contract, and is unable to recover the possession without litigation, then the doors of the courts of this State are open to it, and it stands before the law upon precisely the same footing that residents of this State do—no better, nor no worse. We are unable to see in what way the act in question denies to such corporations the same rights, immunities and privileges that are accorded by law to the citizens of this State, or how it deprives them of the equal protection of the law.' "

The ruling, as previously stated, was predicated upon the theory that said statute was void, and did not prevent the plaintiff from suing in the courts of this State.

The same doctrine was announced by this court in the cases of Sparks v. Jasper County, 213 Mo. 218; Bank v. Lyons, 220 Mo. 538; and Seaman v. Cap-Au-Gris Levee District, 219 Mo. 1.

In discussing a similar statute in the case of State ex rel. v. Grimm, 239 Mo. 135, l. c. 179, this court reviewed most of the case before mentioned and concluded with this language:

"The contention that the plaintiff's right to sue in the courts of this State rests on comity, will receive

notice here.  Counsel for petitioner cite many cases
lending support to their contention, some of which
were decided by some of the most respectable courts
of the country.  In fact this court and the courts of
appeals of this State have so held in a number of
cases; but upon an examination it will be seen that
they were decided prior to the enactment or amend-
ment of the statutes of this State governing this mat-
ter.

"Prior to such enactments it was generally con-
sidered and understood that the right of a non-resi-
dent of this State to sue on a cause of action arising
in some other State, in the courts of this State, rested
purely upon comity, and that our courts could, in any
case where they deemed it wise and proper, decline
to assume jurisdiction over or to try the case.  But
since the enactment of section 1736, and the amend-
ment of section 1737, Revised Statutes 1909, such right
of a nonresident no longer rests solely upon the prin-
ciples of comity, within the broad meaning of that
word.  Those sections are binding upon all the courts
of this State, and whenever a suit is brought in any
court of this State, which is embraced within their
provisions, no court has the legal right to decline ju-
risdiction over it or to try it, as it had prior to such
enactments.

"Those sections read as follows:

" 'Sec. 1736.  Whenever a cause of action has ac-
crued under or by virtue of the laws of any other State
or Territory, such cause of action may be brought in
any of the courts of this State, by the person or per-
sons entitled to the proceeds of such cause of action:
*Provided,* such person or persons shall be authorized
to bring such action by the laws of the State or Terri-
tory where the cause of action accrued.

" 'Sec. 1737.  Whenever any cause of action has
accrued under or by virtue of the laws of any other
State or Territory, and the person or persons entitled

to the benefit of such cause of action are not authorized by the laws of such State or Territory to prosecute such action in his, her, or their own names, then, in every such case, such cause of action may be brought and prosecuted in any court of this State by the person or persons authorized under the laws of such State or Territory to sue in such cases. Such suits may be brought and maintained by the executor, administrator, guardian, guardian *ad litem*, or any other person empowered by the laws of such State or Territory to sue in a representative capacity.'

"These statutes were under consideration in the case of Newlin v. Railroad, 222 Mo. 375, and the court there held that these statutes were founded upon comity, and opened the doors of our courts to causes of action accruing under the laws of sister States. Meaning of course, that the doors were not opened at the discretion of the court, as was formerly the case, but mandatory, in harmony and in keeping with section 2 of article 4, and section 1 of the Fourteenth Amendment to the Constitution of the United States, which read as follows:

"Sec. 2, art. 4: 'The citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.'

"Sec. 1. Fourteenth Amendment: 'All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'

"By reading these two constitutional provisions together, it will be seen that the latter is much broader, in many particulars, than the former; and this is also

true regarding citizenship. By the former nothing was said about citizens of the United States, while the latter in express terms makes all persons born in the United States or naturalized in pursuance to its authority, citizens not only of the State in which they reside, but also citizens of the United States.

"The last section also provides that no State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States, which of course includes all of the citizens of all of the States, and the Supreme Court of the United States has repeatedly held that the latter clause includes corporations, whenever engaged in interstate commerce, or whenever legally authorized to do business in any such State or States. That being true, the Supreme Court of the United States in speaking of the rights of a citizen of Massachusetts to sue in the courts of New York, in the case of Cole v. Cunningham, 133 U. S. l. c. 113 and 114, said: 'The intention of section 2 of article 4 was to confer on the citizens of the several States a general citizenship, and to communicate all the privileges and immunities which the citizens of the same State would be entitled to under the like circumstances, and this includes the right to institute actions. The fact of the citizenship of Butler and Hayden did not affect their privilege to sue in New York and have the full use and benefit of the courts of that State in the assertion of their legal rights.'

"That court has also repeatedly held, under the constitutional provisions before mentioned, that any citizen of the United States or of any State thereof, may sue in the courts of any other State, wherever a citizen of such State may do so under the laws thereof. That court in discussing this question in the case of International Textbook Co. v. Pigg, 217 U. S. 91, l. c. 111, used this language: 'This court held in Chambers v. Baltimore & Ohio Railroad Co., 207 U. S. 142, 148,

that a State may, subject to the restrictions of the Federal Constitution, "determine the limits of the jurisdiction of its courts, and the character of the controversies which shall be heard in them." But it also said in the same case: "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each State to the citizens of all other States to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the States, but is granted and protected by the Federal Constitution.' "

"The same question came before this court in the case of International Textbook Co. v. Gillespie, 229 Mo. 397. There we quoted with approval the foregoing language of the Supreme Court of the United States, and in pursuance thereto, held: '(c) That where a foreign corporation has a valid cause against a citizen of this State it may sue said citizen thereon in the courts of this State, provided a citizen of this State might do the same, notwithstanding the provisions of said section 1026 to the contrary. [Chambers v. Railroad, 207 U. S. 142, 148; United Shoe Machinery Co. v. Ramlose, 210 Mo. 631.]' The same identical question was decided in the cases of the United Shoe Machinery Co. v. Ramlose, 231 Mo. 508, and in Roeder v. Robertson, 202 Mo. 522.

"Both the Federal courts and this court in the cases cited, and in many more, have uniformly held that, whenever a nonresident or a foreign corporation has a valid cause of action under the laws of this State or under the laws of any other State, he or it may sue thereon in the courts of this State, provided legal service can be had upon the defendant, and provided, further, that a citizen of this State, under its

laws, is authorized to sue in our courts on a cause of action similar to the one sued on by said nonresident or foreign corporation; and that, too, despite a statute of the State denying to such corporation such right to sue.

"Those rulings are based upon the ground that, under the constitutional provisions previously mentioned, all citizens of the United States are entitled to all the privileges and immunities which are granted by the laws of any State to her own citizens, as previously stated; and that any statute of a State which denies such right of such person or corporation to sue in the courts of such State is violative of said constitutional provisions and is therefore absolutely null and void.

"That is not only the law as announced by those courts, but it was correctly so announced. It would be both unjust and intolerable for one State of the Union to possess the power and authority to enact a valid statute closing the doors of its courts to citizens of the United States, or of other States, and deny to them the right or privilege of suing in the courts thereof, while the citizens of such State enjoy that right or privilege. To so hold would be not only to nullify the spirit of the provisions of the Federal Constitution previously mentioned, but the letter thereof as well.

"While, as previously stated, counsel for the petitioner cite some respectable authorities holding that the Legislature and courts of a State possess such power and authority, upon an examination of them it will be seen that they were decided solely upon the principle of comity, and the constitutional provisions mentioned were not considered, consequently, they have no binding effect upon this court.

"Having thus seen that the doors of our courts under the law of comity, the statutes of this State as previously quoted, and the constitutional provisions

before mentioned, are ever opened to all citizens of the United States and the citizens of the various States to sue upon any valid transitory cause of action which might be sued upon in our courts by a citizen of this State, it only remains for us, in this connection, to ascertain whether or not the cause of action of Mrs. Rawn, the plaintiff in the case against the petitioner, is a valid transitory cause of action, and could a citizen of this State sue in our courts on a similar cause of action.

"It is not only conceded by all parties to this litigation that the policy of insurance sued on is a valid subsisting contract, that is, there is nothing immoral or unlawful about a contract of insurance in general, nor about this one in particular, but its validity is charged by both parties in the pleadings. But independent of those concessions, the validity of such a contract of insurance could not, in our opinion, be seriously questioned. All of the decisions of the courts of the various States, as well as those of the United States, hold such contract to be lawful and binding.

"We, therefore, have no hesitancy whatever in holding that the policy sued on is a valid contract, that is, there is nothing immoral about it, nor is it prohibited by any law.

". . . Attending the question, could a resident of this State sue on a similar policy to the one in suit, issued under similar circumstances?

"We apprehend that even counsel for the petitioner would not advance so bold a proposition as that; but if they should so do, it would be utterly untenable, for the simple reason that the courts of this State were created by her citizens, primarily for their own use, and, secondarily, for the use of those who may sue therein, under the laws of the United States, or those of comity. To compel a citizen of this State under like circumstances to go to Illinois against his will and sue on such a policy, issued there, when serv-

ice might be had here, would be an outrage, and unwarranted by any authority that we have been able to find.

"We are, therefore, not only of the opinion that the plaintiff may maintain her action in the courts of this State, but we are also of the opinion that under the statutes of this State previously quoted, and the provisions of the Federal Constitution before mentioned, the courts of this State are compelled to entertain jurisdiction thereof, and to try it according to law."

Some of the cases previously mentioned announcing a contrary doctrine, proceed exclusively upon the rules of comity, and totally ignoring the United States constitutional provisions previously mentioned, which place all citizens of the United States upon the same footing of equality with citizens of this State, in so far as the privileges and immunities therein mentioned are concerned; consequently, wherever a citizen of this State may sue in our courts, so may any citizen of the United States.

Had the Cement Company been a citizen of England or some other foreign country quite a different proposition might be presented; but in the case of the King of Prussia v. Knuepper's Admr., 22 Mo. 550, this court held that a foreign sovereign might sue in the courts of this State, upon the ground that, if such right was denied, that ruling would do violence to the old maxim that there is no right without a remedy. While this case is not directly in point in this, yet it very forcibly shows the liberal policy with which the courts of this State look upon the demands of foreign persons, even though they be not citizens of the United States, who are bound together as brothers by an indissoluble bond of union.

According to the foregoing rulings of this court I have no hesitancy whatever in saying that if it was the design of the Legislature by enacting section 3040,

Revised Statutes 1909, to close the doors of the courts of this State to any litigant, a citizen of any State of the United States, then it would be unconstitutional, null and void under both the State and Federal constitutions, and therefore constitutes no bar to the plaintiff's right to institute and prosecute this suit in the courts of this State.

III.   This brings us to the consideration of the last proposition presented by this record for the consideration of this court, and that is, is the plaintiff entitled to a recovery on the merits in this case?

In my opinion that question must be answered in the affirmative, for two reasons; first, because, if it be conceded, as contended for by appel-

**Stakeholder: Unexecuted or Void Contract.** lant, that the proposed contract between the Cement Company, the respondent, and the Gas Company, the appellant, is absolutely null and void under the sections of the statute previously mentioned, then the title to the $10,000, put up by the former in the hands of Campbell, for the use of the latter when the proposed contract should be executed, never passed from the Cement Company, the respondent, to Campbell, the stakeholder, or to the Gas Company.

This question was fully considered and decided in favor of the respondent's position in the cases of Roeder v. Robertson and United Shoe Machinery Co. v. Ramlose, supra, and in the numerous other cases therein cited.

After a careful reconsideration of those cases, I see no valid reason for changing my views regarding the law therein announced; but upon the contrary, I am more firmly convinced upon reason and authority, that the doctrine therein is both just and sound.

The second reason for believing that the respondent is entitled to a recovery is briefly this: The undisputed evidence in the case shows that the proposed con-

tract between the respondent and the appellant companies was never entered into, and therefore the title to the $10,000 placed in the hands of Campbell, the stakeholder, by respondent, for the use of the appellant when the contract should be executed, never passed from the former nor vested in the latter. That being unquestionably true, the respondent is entitled to a recovery of the money, and Campbell has no legal or equitable claim whatever to retain the same, and I know of no law or rule of morals that could be interposed against the respondent's right to a recovery herein.

So believing, I am of the opinion that the judgment of the circuit court should be affirmed, except as to the Gas Company, and as to it the judgment is reversed.

*Lamm, C. J.*, and *Bond* and *Faris, JJ.*, concur; *Walker, J.*, dissents in separate opinion in which *Graves* and *Brown, JJ.*, concur; *Brown, J.*, dissents in separate opinion in which *Graves, J.*, concurs.

## DISSENTING OPINION.

BROWN, J.—Not being able to concur in the majority opinion filed in this cause, I shall state my reasons for dissenting.

In order that the views which I shall herein express may be more fully understood, I append a copy of the plaintiffs' articles of association showing the several purposes for which it was incorporated. Said articles read as follows:

> First. We, the undersigned, for the purpose of forming a corporation under the laws of the State of West Virginia, hereby agree to become a corporation by the name of Oklahoma Portland Cement Company.
>
> Second. The principal place of business of said corporation shall be *located at Number* 1006 *and* 1008 *Baltimore avenue, in the city of Kansas City, in the county of Jackson and State of Missouri.* Its chief works shall be located in the Indian Territory.

Third.   The object and purposes for which this corpora-
tion is formed are as follows:   To produce, manufacture, buy,
sell and otherwise handle and deal and traffic in cement, lime,
brick, stone, both natural and artificial, and other building
and construction material, and all products and articles con-
sisting or partly consisting of stone, shale and other minerals
or mineral earth and materials and all products thereof; to
produce, mine, *buy, sell and otherwise handle and deal and
traffic in* coal, oil, *gas* and other minerals and mineral
products; to *acquire,* own, lease, occupy, use, mine, hold and
develop *lands* for the purpose of producing all or any of the
substances, products and materials, hereinbefore mentioned,
and for all other uses connected with the objects and purposes
of the corporation as herein stated; to construct bridges, build-
ings, machinery, railroads, elevators, waterworks, gas works
and electric works and lines, pipe lines for the transportation
of oil, gas, water and other fluids, aqueducts, canals and
other works, and to exercise any and all powers necessary or
convenient to the carrying out of said object and purposes, or
which now are or hereafter may be authorized by law.
     (The italics are mine.)

I.   Plaintiff's learned counsel, while apparently
admitting that his client has not been licensed to
transact business in Missouri, as-
**Foreign**
**Corporation—Right** serts that it is, nevertheless, entitled
**to Maintain** to prosecute this action in the courts
**Suit.** of this State, because the dealings
and transactions out of which this
litigation arose were with citizens of the State of
Oklahoma, and affected only property located in that
State.   That sections 3039 and 3040, Revised Statutes
1909, only prohibit foreign corporations from the
"doing of business in this State with citizens of this
State" before obtaining a license to transact business
here.   He cites State ex rel. v. Grimm, 239 Mo. 135;
International Textbook Co. v. Pigg, 217 U. S. 91;
Chambers v. Railroad, 207 U. S. 142-148; United Shoe
Machinery Co. v. Ramlose, 231 Mo. 508; and Roeder v.
Robertson, 202 Mo. 522.

     Section 3039, Revised Statutes 1909, requires
every foreign corporation "now or hereafter doing
business within this State" to pay a corporation tax

on that part of its capital stock "which is represented by its property located and business transacted in Missouri," and to procure a license to do business in this State.

Section 3040, Revised Statutes 1909, further provides that a foreign corporation "now doing business in or which may hereafter do business in this State, which shall neglect or fail to comply with the conditions of this law" (which obviously includes the requirements of section 3039, supra), "shall be subject to a fine of not less than one thousand dollars," and in addition to such fine every foreign corporation so offending shall not be permitted to *"maintain any suit or action, either legal or equitable, in any of the courts of this State, upon any demand, whether arising out of contract or tort."*

The construction of these sections of our statutes before cited has been before this court several times, and has been so interpreted as to open the doors of our courts to foreign corporations under circumstances which at first impression would appear to be forbidden by the letter of the statutes before cited.

In the case of United Shoe Machinery Company v. Ramlose, 231 Mo. 508, cited by plaintiff, it was held that while a lease of machinery by a foreign corporation to be used in the State of Missouri by a citizen thereof was void, because the foreign corporation had not secured a license to do business in this State, yet as the invalidity of the lease did not destroy or affect the title of the foreign corporation to the machinery leased, it should be permitted to replevy said property through the courts of this State.

The case of State ex rel. v. Grimm, 239 Mo. 135, also cited by plaintiff, is not in point here on account of the total dissimilarity of the facts in that case and this. The Grimm case involved the right of a citizen of Illinois to enforce in the courts of this State a con-

tract of life insurance entered into in Illinois with a California corporation.

The case of International Textbook Co. v. Pigg, 217 U. S. 91, involved the construction of a law of Kansas somewhat similar to our own. In that case the Textbook Company *maintained no office in Kansas,* but was domiciled in the State of Pennsylvania and obtained its business in other States through solicitors. Its chief business was teaching its patrons useful scientific information by correspondence through its Pennsylvania office. It was held in that case that the business of the Textbook Company came within the purview of the Interstate Commerce Law and plaintiff could not be denied the right to enforce its contracts through the courts of Kansas.

In the case of Roeder v. Robertson, 202 Mo. 522, also cited by plaintiff, this court held that, while a sale of personal property on credit in this State by a corporation not licensed to transact business in Missouri was invalid, such foreign corporation could not take advantage of its own wrong and regain possession of the property sold, without placing the purchaser *in statu quo,* by refunding to him the money and property it had received through such invalid sale.

It will thus be seen that the facts and issues of law in the case at bar are not the same as in any of the cases cited by plaintiff. The case of International Textbook Company v. Pigg, 217 U. S. 91, holding that a Kansas statute similar to ours did not apply to a foreign corporation with its chief office in another State and engaged in interstate commerce with the citizens of Kansas, comes nearer supporting plaintiff's contention than any other authority cited by it, or found by us. However, in the case at bar it is not alleged in the pleadings, or proven by the evidence, that plaintiff was engaged in interstate commerce when the business was transacted that resulted in this litigation. The evidence does not disclose that plain-

tiff ever did any business, except change its name and sell its capital stock, before attempting to purchase the property of defendant Citizens Gas Company.

The respondent does not deny that in attempting to make the purchase before mentioned it was "doing business" within the meaning of section 3040, supra, but it asserts that, notwithstanding plaintiff had no license to transact business in Missouri, and notwithstanding the further fact that it maintained its main office (in fact, its only office) in this State, it did not violate our law by transacting business with defendants, because said defendants are not citizens of Missouri, and the property about which the negotiations were had was not located in this State. I am convinced that this contention is unsound.

I have not been able to find any language in our statutes or any adjudicated case which sustains plaintiff's position on this point, and I am unable to see why transacting business with a nonresident, or other stranger who is temporarily within our gates, is not doing business in this State to the same extent as though such transactions were had with citizens of this State.

By referring to plaintiff's charter, hereinbefore quoted, it will be observed that its business is "to *buy,* sell and otherwise handle and deal in coal, *gas* and other minerals and mineral products," so that in making the attempted purchase from the defendant Citizens Gas Company plaintiff was carrying out one of the express powers of its charter. It is contended by the attorney for plaintiff that the pipe line which it attempted to purchase is real estate. If that be true, then plaintiff was also exercising another power of its charter by attempting to *"acquire"* land.

If the officers of plaintiff and defendant Gas Company had merely met in this State to negotiate a purchase or sale of property in another State, that fact alone might not amount "to doing business in this

State'' so as to require either party to procure a
license to transact business here.   But in the case at
bar the plaintiff located its chief office in our State for
the express purpose of buying and selling gas, lands
and other things, and we think it may be fairly in-
ferred from the general phraseology of its articles of
incorporation that it was intended by the incorpora-
tors that the principal business of plaintiff should be
the purchase and sale for profit of the classes of prop-
erty named in its charter, although it acquired the
incidental power to do other business.

Pursuant to the express provisions of plaintiff's
charter it transacted at its said office in Missouri some
of the very business for which it was incorporated.   I
therefore hold that in negotiating with said Citizens
Gas Company to purchase its contract for furnishing
gas and its pipe line, and in depositing the $10,000
with defendant Campbell, the plaintiff was doing
business in the State of Missouri in accordance with
the powers recited in its charter, and also within the
purview of sections 3039 and 3040, Revised Statutes
1909.

The provisions of sections 3039 and 3040, supra,
are not a discrimination against foreign corporations,
nor do those sections deny to such foreign corpora-
tions the equal protection of the law as guaranteed by
the Fourteenth Amendment to the Constitution of the
United States.

In construing statutes all such laws as stand *in
pari materia* should be considered and construed to-
gether.   [Macke v. Byrd, 131 Mo. 682; Blyston-
Spencer v. Railroad, 152 Mo. App. 118.]   Under the
laws of Missouri domestic corporations organized for
profit must pay a corporation tax to the same extent
and amount as foreign corporations, and procure a
charter before they can enter the business world and
receive title to property, or use the courts of this
State to enforce their rights.   [Art. 10, sec. 21, Con-

stitution of Missouri; Secs. 2976 and 3039, R. S. 1909; Douthitt v. Stinson, 63 Mo. 268, 1. c. 277; Hurt v. Salisbury, 55 Mo. 310; Queen City Furniture and Carpet Co. v. Crawford, 127 Mo. 356; Western & Atlantic Railroad Co. v. Dalton Marble Works, 122 Ga. 774; 30 Cyc. 27, 30.] So that when our General Assembly required foreign corporations organized for profit and doing business in our State to assume the same burdens as domestic corporations, it was only declaring a self-evident principle of natural justice. That provision of section 3040, Revised Statutes 1909, prohibiting foreign corporations from maintaining suits in this State before they have obtained a license to do business here, is a peculiarly equitable law. A very large per cent of the work of our courts is devoted to hearing and determining actions to enforce the rights of corporations—foreign corporations consuming their full share of our time. [Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404.]

It is undoubtedly within the power of the States to place reasonable limitations upon the classes of cases that may be maintained in their several courts. The case of Chambers v. Railroad, 207 U. S. 142, involved the construction of an Ohio statute which provided that suits for the wrongful death of a person, occurring in another State, could only be prosecuted in the State of Ohio where the deceased was a resident of that State. The constitutionality of that statute was upheld by the decision last cited, because it operated uniformly upon all heirs of the person whose death was wrongfully caused, whether such heirs resided in Ohio or elsewhere. The doctrine of this Chambers case is cited with approval in St. Louis & Iron Mountain Ry. Co. v. Taylor, 210 U. S. 1. c. 285; Maiorano v. Railroad, 213 U. S. 1. c. 275; Denver and Rio Grande R. R. Co. v. Wagner, 167 Fed. 1. c. 79; and St. Bernard v. Shane, 201 Fed. 1. c. 457.

A state having the right to forbid the heirs of a deceased person to prosecute suits in its courts because their ancestor did not reside within its borders at the time of his death, it must necessarily follow that a State may prescribe the terms upon which corporations may prosecute actions in its courts, provided all corporations (foreign and domestic) are accorded the same privileges and subjected to the same restrictions. This the laws of Missouri do. The Chambers case, supra, is cited by plaintiff, but we are unable to understand how that case tends to support its contention.

For the foregoing reasons I dissent from the views expressed and conclusion reached by the majority of my brethren. *Graves* and *Walker, JJ.,* concur in the views expressed in this dissent.

## DISSENTING OPINION.

WALKER, J.—I dissent from the majority opinion for these reasons: The Cement Company was a foreign corporation; it had established its principal office in Kansas City, Missouri; it was engaged in business there in so far as any company of this character can transact business in a large city, in selling or attempting to sell bonds to secure funds to build a cement manufacturing plant elsewhere; it had not in any particular complied with or attempted to comply with our statute regulating the right of foreign corporations to do business in this State; as a consequence, it had no legal entity or existence here, and its contracts were invalid and unenforceable in our courts. To hold otherwise would be to nullify our statute regulating the admission of foreign corporations into this State.

The facts in this case are altogether different from those cited in the majority opinion in support of the conclusion reached therein, in that the latter in-

volved contracts made by foreign corporations doing business elsewhere with citizens of our State, and could have been properly upheld under the doctrine of interstate comity. No such question is under consideration here, but this bald proposition is presented: Can a corporation which has been created elsewhere establish itself within our borders, transact business, enter into contracts, and enforce them in our courts in defiance of our laws?

I cannot agree with the reasoning, or consent to the conclusion, which would, in effect, give this power to these purely artificial entities, and I am, therefore, of the opinion that the statute regulating the admission of foreign corporations into this State, is not in contravention of either the State or Federal Constitution, and hence should be upheld. *Graves* and *Brown, JJ.*, concur.