**NEWSPAPER PUBLISHERS, INC., a Corporation, Plaintiff-Respondent,**

v.

**ST. CHARLES JOURNAL, INC., a Corporation, Defendant-Appellant.**

No. 31921.

St. Louis Court of Appeals.

Missouri.

July 19, 1966.

Rehearing Denied Sept. 13, 1966.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Martin Schiff, Jr., Carroll J.

Donohue, Wilbur B. Jones, St. Louis, for defendant-appellant.

Barksdale, Abbott & Wallace, Victor A. Wallace, St. Louis, for plaintiff-respondent.

WOODSON OLDHAM, Special Judge.

Plaintiff, an Illinois Corporation, engaged in the newspaper printing business, brought suit to recover for printing the St. Charles Journal for defendant, a Missouri Corporation engaged in publishing several newspapers, under a contract for such services. The defendant counterclaimed against plaintiff for damages sustained as a result of the alleged anticipatory breach of the contract for printing the St. Charles Journal because of plaintiff's failure to continue performance under the terms of the written contract. A jury was waived and the trial court found for plaintiff on its petition and entered judgment for plaintiff in the sum of $3,497.14 (plus interest) and costs and further found in favor of plaintiff and against defendant on defendant's counterclaim, holding that plaintiff was not guilty of an anticipatory breach of contract and that defendant voluntarily took its printing from plaintiff by mutual agreement. The amounts involved were less than $15,000.00 and this court has jurisdiction.

The written contract in issue was dated March 31, 1961, and provided that plaintiff was to print the St. Charles Journal newspaper published by defendant on a weekly basis at specified prices per page, with plaintiff to furnish all paper, ink, machinery and other materials, supplies and services. The contract was to continue in effect unless terminated by defendant giving six months written notice or by plaintiff giving eighteen months notice of intention to terminate. The contract was put into effect in July, 1961 when plaintiff commenced printing the St. Charles Journal, defendant's newspaper, and continued through the week of July 19, 1962, when defendant withdrew its printing from plaintiff, under circumstances hereinafter discussed, and obtained printing services elsewhere at higher prices. Plaintiff sued for defendant's failure to pay for printing of the last two issues of the St. Charles Journal and defendant counterclaimed for the amount of the alleged higher prices paid The St. Louis Mirror, owned by defendant and another company, for printing said paper during the period said contract was alleged to be in effect after the alleged anticipatory breach of the contract by plaintiff.

At the trial below and upon this appeal two main issues were presented to the court: (1) That plaintiff was a foreign corporation doing business within this state and was not entitled to maintain its action against defendant because it had failed to qualify to do business in this state under the provisions of Chapter 351, R.S.Mo. 1959, V.A.M.S., before bringing suit, although plaintiff did so qualify by registering with the Secretary of State during the pendency of the suit; (2) That plaintiff's conduct constituted an anticipatory breach of contract which justified the defendant in obtaining new printing services for its newspaper.

The evidence presented by defendant concerning defendant's claim that plaintiff was illegally doing business in this state without qualifying to do so under Chapter 351, R.S.Mo.1959, V.A.M.S., came from interrogatories directed to plaintiff by defendant. These interrogatories dealt generally with plaintiff's methods of doing business with customers other than defendant in the St. Louis area and revealed that plaintiff "either upon occasion or as a matter of routine" picked up and delivered manuscript, proof and copy from and to Missouri customers, solicited business by advertisement and otherwise, and owned or rented trucks operated by drivers employed by plaintiff for delivery purposes. Plaintiff's

evidence (uncontradicted by defendant) was to the effect that the parties adhered to and carried out the terms of the contract at issue in this case which provided that all services performed by plaintiff for defendant were to be performed at plaintiff's plant in Illinois. In fact the only evidence as to the services performed under the terms of the instant contract was to the effect that such services were performed by plaintiff at its plant in Illinois and were thus interstate in character.

The burden was upon the defendant to establish that plaintiff was unlawfully doing business within the state and was not entitled to maintain its action upon this contract at issue. Superior Concrete Accessories v. Kemper, 284 S.W.2d 482 (Mo.Sup.1955). Proof of acts constituting the doing of business within the state as to other customers without a license does not prevent the plaintiff from performing another perfectly valid transaction or series of transactions in interstate commerce which is not subject to state regulation and would not prevent the plaintiff from bringing an action as a result of said interstate transactions. Superior Concrete Accessories, Inc. v. Kemper, supra, l. c. 487; British American Portland Cement Co. v. Citizens Gas, 255 Mo. 1, 164 S.W. 468 (1914); Gutta Percha Manufacturing and Rubber Co. v. Lehrack, 201 Mo.App. 556, 214 S.W. 285 (1919).

The evidence conclusively showed that the performance of the conditions of the contract in issue were done in interstate commerce and the finding of the trial court that plaintiff was, as a matter of law, entitled to maintain this action is affirmed.

Having come to this conclusion under the facts and law of this case we deem it unnecessary to consider or pass upon the effect of plaintiff's registration with the Secretary of State and qualification to do business within the State under Chapter 351, R.S.Mo.1959, V.A.M.S., during the pendency of the suit in spite of defendant's claim that plaintiff, by so qualifying, tacitly admitted doing business in the State unlawfully since such a tacit admission, if any, would not change the facts and law here involved.

We come now to defendant's counterclaim for damages as a result of the alleged anticipatory breach of the contract for printing services and in connection therewith must consider the evidence more fully than set out above. As stated, the contract was entered into on March 31, 1961, and went into effect in July, 1961. Early in 1962 (perhaps as early as February) plaintiff began having financial difficulties and began requesting relief from the terms of the contract in the form of per page price increases for printing the St. Charles Journal. These conversations culminated in a meeting of the officers of the two parties on April 2 or April 7 (the date being disputed but immaterial) at which plaintiff delivered to defendant a notice of its intention to terminate the contract, (Exhibit D3), pursuant to the terms thereof and again requesting an increase of the prices paid pending termination of the contract. The notice was prepared at this meeting at the suggestion of defendant's officers and by them in their office. The parties all testified that defendant agreed to remove their printing from plaintiff's plant but disagree upon the conditions for so doing.

Plaintiff claims defendant agreed to remove their printing from plaintiff's plant as soon as possible, giving three weeks notice of withdrawal, and in the interim to pay an increase of $4.00 per page for printing the Journal. Defendant claims that they agreed to remove their printing from plaintiff's plant but refused to pay the increased price per page except upon conditions to be furnished to plaintiff at a later date. A few days after the above mentioned meeting the defendant delivered to plaintiff an undated letter setting out conditions for the payment of the increased price. By letter dated May 10, 1962, plaintiff reject-

ed the conditions and insisted upon the increased price per page claimed to have been agreed to at the above mentioned meeting.

It appears from the testimony that there were other difficulties between the parties contributing to plaintiff's financial difficulties. Plaintiff claimed late delivery of news copy, furnishing of extra proofs and late changes of ad copy after proofs were furnished, caused overtime and increased the cost of printing defendant's paper to the point where plaintiff was losing money and induced plaintiff to ask for termination of the contract and extra prices per page pending termination. From the testimony of defendant's officers it appeared that defendant furnished copy as it saw fit, sometimes ahead of schedule, sometimes on schedule and sometimes late, although one of defendant's witnesses *thought* "it averaged out being on time."

The defendant's officers testified that in January or February 1962 they became interested in cold type printing, then a relatively new process, as being more suited to their needs and allowing more versatility and providing a more attractive publication and began acquisition and installation of machinery for that type printing in the St. Louis Mirror plant. In February, 1962 plaintiff withdrew the printing of the St. Louis Mirror (not covered by the contract involved here) from plaintiff's plant and commenced printing in the Mirror plant by the new process.

From the time plaintiff first disclosed it was having financial difficulties in February, 1962, until the final withdrawal of the printing of the Journal from plaintiff after the July 19th, 1962 issue (following three weeks notice as agreed by the parties at the above mentioned meeting) defendant continued to acquire and equip the Mirror plant (owned by defendant) with the cold type printing machinery, although not of

a capacity to completely handle the Journal printing. When the printing of the Journal was withdrawn from plaintiff's plant, defendant had sufficient cold type equipment in the Mirror plant so that type for the Journal was set by the cold type process in the Mirror plant, owned by defendant, and printed at the St. Louis Record plant at prices above those provided in the contract. Defendant's counterclaim is for the increase in the cost of the printing over the contract price.

If the acts and statements of plaintiff's officers are considered alone, without consideration of the agreement, acts and statements of defendant's officers, plaintiff was guilty of an anticipatory breach of contract and defendant would be entitled to damages resulting therefrom. Quivirian Development Co. v. Poteet, 268 F.2d 433, 439 (8th Cir. 1959); Hawkinson v. Johnston, 122 F.2d 724, 137 A.L.R. 420 (8th Cir. 1941); Rexite Casting Co. v. Midwest Mower Corp., 267 S.W.2d 327 (St.L.App. 1954); Ewing v. Miller, 335 S.W.2d 154, 158 (Mo.1960).

■ However, it appears from the evidence (and the learned trial judge so found) that the defendant voluntarily agreed to the termination of the contract at the meeting above mentioned and that there was no anticipatory breach of contract by plaintiff and defendant is not entitled to recover on its counterclaim.

There is no dispute as to the fact that defendant had not paid for the printing of the last two issues of the St. Charles Journal and the judgment for plaintiff on its petition and for plaintiff on defendant's counterclaim is affirmed.

WOLFE, P. J., and ANDERSON, J., concur.