TAYLOR & MARTIN, INC., a Nebraska corporation, Plaintiff-Respondent,

v.

HILAND DAIRY, INC., a Missouri corporation, Defendant-Appellant.

No. 13221.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 22, 1984.

Motion for Rehearing or to Transfer to Supreme Court Denied Sept. 11, 1984.

Application to Transfer Denied
Oct. 9, 1984.

861

Kerry D. Douglas, Douglas, Douglas, Lynch & Ashlock, P.C., Bolivar, for plaintiff-respondent.

Flavius B. Freeman, John D. Compton, Richard L. Schnake, Neale, Newman, Bradshaw & Freeman, Springfield, for defendant-appellant.

TITUS, Judge.

In this action plaintiff, Taylor and Martin, Inc., seeks to recover the purchase price of a refrigerated semi-trailer unit sold to defendant, Hiland Dairy, Inc., at an auction conducted by plaintiff in 1976 near Dallas, Texas. Questions for our consideration on appeal include (1) whether plain-

tiff, a Nebraska corporation not registered to do business in Missouri, can maintain this action; (2) whether plaintiff's failure to comply with the Texas Certificate of Title Act rendered the sale void *ab initio* for all purposes, including passage of the risk of loss; and (3) whether the risk of loss of the trailer, presumably stolen from the vicinity of the auction site before defendant could transport it to its Springfield, Missouri, plant, passed through plaintiff, as agent for the seller, to defendant, as buyer.

Defendant, a Missouri corporation with its principal place of business in Springfield, Missouri, engages in the processing, distribution, and sale of milk and milk products. Plaintiff purports to be the largest auctioneer of tractors, trailers, and like equipment in the United States, holding from 30 to 35 auction sales each year in various states. Plaintiff scheduled one such sale for September 2, 1976, on the grounds of a Holiday Inn near the Dallas-Fort Worth (Texas) Airport. There was a good deal of dispute at trial concerning the precise location of the sale site on the Holiday Inn property. The evidence suggests and the trial court found that, while plaintiff's original plan had been to conduct the sale entirely on an unpaved portion of the motel property, torrential rains during the week just prior to the sale so muddied that area that the adjacent paved lot had to be used to accommodate late-arriving sale items. In any event, the sale took place entirely on property owned by Holiday Inn and made available to plaintiff via "oral license."

Plaintiff's "advance personnel" began to arrive at the sale site the Friday next preceding the sale on Thursday, September 2, 1976. Plaintiff's auctioneers (those actually "calling" the sale) and officers arrived over the weekend. A final crew of employees arrived Tuesday, August 31. Because plaintiff had on previous occasions encountered vandalism to consigned items, some arrangements were made for security at the sale, though the form and extent of these measures is not entirely clear. For example, while the trial testimony of plaintiff's vice president, Lewis Munday, indicates there was more than one guard on duty, plaintiff, in answer to defendant's interrogatories concerning the matter of security at the sale responded that "a security guard was employed." What protection there was commenced Sunday, August 29, and ceased no later than the morning of Friday September 3, the day after the sale. Munday testified that plaintiff made no representations that security would continue beyond that time.

Munday estimated that approximately 700 persons attended the auction, about half of whom formally registered to bid. Prospective bidders registered by completing a form styled "Registration" which required such information as the registrant's name, the name of the company for which he was bidding, and that company's address, telephone number, and bank. The form also provided space where the registrant could indicate the manner in which he intended to make payment in the event he successfully bid.[1] Immediately beneath this space were listed various "Terms of Sale." These terms were set forth in all-capital red lettering as was the other printed matter on the form but were in slightly smaller type and in a somewhat different style of print. The third enumerated term specified that "The undersigned takes full responsibility for any item purchased at the time it is sold"; the fourth, inter alia, that "[The undersigned] agrees to make complete and full settlement on all purchases within one hour after the conclusion of the auction in American currency or bank certified funds or the equivalent;" and the sixth that "Unless cash, certified funds or cashiers check is used for payment, titles will

1. This portion of the form reads thus:

Intent of Payment

☐ Currency     ☐ Certified Funds     ☐ Personal Check     ☐ Co. Check
Letter of Credit _____ If No Credit Letter I.D. _____

be attached to check for pick up at your bank." At the bottom of the form was a space for the registrant's signature.

Among those who registered to bid was Ray Eagleburger, an employee of defendant who had come to the sale for the purpose of purchasing some refrigerated ("reefer") semi-trailers for defendant's operations. Upon his arrival at the Holiday Inn, Eagleburger completed a bidder registration form at the sale registration desk set up in the lobby of the motel. He testified that he did so because he thought it necessary in order that he obtain a bidding number. He received bidding number 753 upon completion of the registration form and plaintiff's personnel subsequently procured a room for him at the motel.

The auction was held primarily on the unpaved lot behind the motel. Because of the heavy rains alluded to supra, not all of the items to be sold could be placed on and auctioned from this lot. Consequently the adjacent paved parking lot was used to accommodate the "overflow" goods. Among the more than 100 items up for bids were five 1973 Hobbs refrigerated semi-trailers consigned to plaintiff by Mercury Express, Inc., of Texarkana, Texas. It was this type of unit on which Eagleburger bid, offering up to $14,000 per trailer before being outbid by one Jack Watson of Texarkana, Texas, who offered $14,100 per trailer.[2] The Hobbs unit was "struck off" to Watson, who elected to purchase all five of that model. Plaintiff's clerk wrote Watson's bidding number (954) in the upper left corner of an "auction memorandum" as evidence of his successful bid on the trailers.[3] Watson then initialed this document in a space marked "Purchaser."

Shortly after Watson had successfully bid, Eagleburger and Bert Putman, then president of defendant, approached him on behalf of defendant to inquire whether he would sell defendant four of the five Hobbs trailers. He agreed to do so, for $400 more per trailer than he had bid. Putman gave Watson a check for $1600 and Watson and Eagleburger went to plaintiff's "settlement trailer" to complete the transaction with plaintiff. Exactly what transpired there is unclear but it appears that some indication was made to plaintiff's settlement personnel that Eagleburger desired to settle for the trailers instead of Watson. Plaintiff's personnel agreed to this and accepted a sight draft from Eagleburger in the amount of $56,400 as payment for the four trailers. One of plaintiff's employees marked through Watson's bidding number on the auction memorandum and wrote Eagleburger's bidding number beside it; this notation was the only documentary evidence that Eagleburger, rather than Watson, had settled for the trailers. Plaintiff's employee attached to the sight draft the certificates of title to the four trailers and

---

**2.** The trailers were sold on a "choice" basis, i.e., the bidder extending the highest bid with respect to a particular model was entitled to purchase as many of that model as he desired, each at the high bid price.

**3.** The auction memorandum was described at trial as a four-part document but only three parts are among the exhibits before us. Two of these, headed "Taylor and Martin, Inc., Auctioneers," are identical, save as to color, and another is denominated "Bill of Sale." The two substantively identical parts contain, inter alia, the following printed avowals: "The undersigned buyer warrants that he was the high bidder on the item stated above; that he purchased said item at the terms 'as is' & 'where is'; ... that he will take full responsibility for the item at the time of purchase including full liability and property damage insurance coverage; that he will make full and complete settlement within

one hour after the conclusion of the auction, in American currency or bank certified funds, or the equivalent; ...." Above this recitation are spaces for the title and serial numbers of the item in question; the name and address of the seller; and the year, make, model and body style of the item. At the bottom of the document is a space for the purchaser's signature, the date of purchase, and the purchase price of the item. Identical spaces for this information are provided on the "Bill of Sale." In fact, all three of these auction memorandum components are completed, via carbon paper, with a single impression and, were it not for the variance in printed matter on the "Bill of Sale," would constitute duplicate originals. The "Bill of Sale" states that "For value received, receipt of which is herewith acknowledged, the undersigned seller does hereby grant, sell, and deliver to the undersigned buyer the property identified herein as item."

sent these items to plaintiff's bank. The certificates of title were to be sent by plaintiff's bank to defendant at such time as defendant's bank paid the draft. In the event defendant's bank failed to pay the draft, the certificates were to be returned to plaintiff.

Eagleburger testified that he knew of no reason why defendant could not have removed the four trailers from the sale site immediately after settlement, that he knew defendant had a right to take them as of that time. He further related that plaintiff had neither placed any express restrictions on removal of the trailer nor conditioned defendant's right to take them upon payment of the tendered draft. He stated that, although he was told by someone he assumed to be an employee of plaintiff that defendant did not have to move them immediately, he knew defendant could do so. He also indicated that plaintiff made no representation to the effect that items would be guarded after sale.

Because of the muddy condition of the unpaved lot on which the Hobbs trailers rested, their immediate removal was, in Eagleburger's words, "an impossibility." However, transportation arrangements were made the day after the sale. John Gilmore, a "transport driver" for defendant, was engaged by defendant to deliver the trailers from the auction site to Springfield, Missouri. In order to facilitate this task, Gilmore first arranged to have the trailers moved from the muddy, unpaved lot to the adjacent paved area of the Holiday Inn premises. He thereafter transported one of the trailers to Springfield on September 5, returned to Dallas and picked up and delivered another trailer to Springfield on September 6. When he returned to pick up the third trailer on September 7, he discovered the fourth missing.

Upon learning of the fourth trailer's disappearance, defendant directed its bank to stop payment on the sight draft and to hold the certificates of title to the trailers. After negotiation, plaintiff and defendant agreed that defendant would pay for the three trailers that had already been delivered; to that end a new sight draft was drawn and delivered to plaintiff. Defendant did not tender payment for the missing trailer. Because plaintiff guarantees its consignors payment for consigned goods within ten days of the fall of the hammer signalling a successful bid on such goods, plaintiff was obligated to tender payment to Mercury Express, Inc., for all four Hobbs trailers. Plaintiff did so and subsequently filed this action seeking from defendant the bid price of the missing trailer. The trial court, sitting without a jury, rendered judgment in plaintiff's favor and defendant appealed.

■ Defendant in its first point contends the trial court erred in failing to dismiss plaintiff's action on the ground plaintiff is not qualified to do business in Missouri and is therefore barred by § 351.635 [4] from maintaining any suit or action in any court of this state. Defendant first raised the issue of plaintiff's lack of capacity to sue in a motion to dismiss filed in November, 1977. This motion reflected defendant's supposition that the mere failure of a foreign corporation to procure a certificate of authority to transact business in this state *ipso facto* precludes such corporation access to this state's courts. We note that as of the time the motion was filed plaintiff had conducted but one auction sale in Missouri and that sale then constituted the extent of plaintiff's business in this state (exclusive of the regular mailing into this state of brochures advertising upcoming

---

4. Statutory references are to V.A.M.S., except where otherwise indicated.

Section 351.635 provides, in pertinent part:

"Every foreign corporation now doing business in or which may hereafter do business in this state which shall neglect or fail to comply with the provisions of subsection 1 of section 351.570 shall be subject to a fine of not less than one thousand dollars to be recovered before any court of competent jurisdiction; ... in addition to which penalty, no foreign corporation, failing to comply with this chapter, can maintain any suit or action, either legal or equitable, in any of the courts of this state, upon any demand, whether arising out of the contract or tort, while the requirements of this chapter have not been complied with."

sales). Thus, the motion was properly overruled on the ground plaintiff then came within the "isolated transaction" exception to the requirement of § 351.570.1 that foreign corporations obtain a certificate of authority in order to transact business in this state.[5]

■ Defendant did not raise the incapacity issue in its subsequent answer, filed in December, 1978.[6] In the interim between the trial court's ruling on defendant's motion to dismiss and trial in July, 1982, plaintiff conducted at least eight auction sales in Missouri without ever having obtained a certificate of authority.[7] At trial defendant rendered a reprise of its earlier motion to dismiss, again questioning plaintiff's capacity to sue.[8] The trial court postponed its ruling on this motion until consideration of the case in its entirety, at which time it was overruled. The court concluded that "the prohibition against maintaining any action at law or in equity within the State of Missouri applies only to causes of action which arise out of a foreign corporation's conduct of illegal business in the State of Missouri and does not prevent their (sic) maintaining an action at law or in equity to enforce rights arising out of transactions that were conducted in the State legally or which were conducted out of state and which, for reasons of venue and jurisdiction, are required to be brought in this State."

Defendant cites *Luna v. Iowa-Mo Enterprises, Inc.*, 597 S.W.2d 278 (Mo.App.1980), as refuting the trial court's interpretation of § 351.635. In *Luna*, plaintiffs sued defendant, a foreign corporation, for default in payments due them on a note. Defendant counterclaimed for breach of contract. The trial court sustained plaintiffs' motion to dismiss defendant's counterclaim for the reason that defendant's certificate of authority to do business in Missouri had been forfeited by the secretary of state prior to institution of the suit. On appeal from the judgment for plaintiffs, defendant contended the trial court erred in dismissing its counterclaim since it arose prior to defendant's forfeiture. In affirming the trial court's dismissal of the counterclaim, the court noted that "[t]he same statutory prohibition [as appears in § 351.600(4), the provision actually involved in *Luna*] appears in § 351.635, which is the penalty section of the foreign corporation law. These statutes clearly express the intent of the Missouri Legislature that a foreign corporation may not maintain a suit or action in any court of this state upon any demand, contractual or tortious, at a time when such corporation does not have authority to do business in this state." The court went on to state that "[f]oreign corporations have no greater rights than domestic ones. Missouri corporations cannot maintain any le-

5. Section 351.570.1 provides, in pertinent part: "1. No foreign corporation shall have the right to transact business in this state including business on any federal or state owned property in this state until it shall have procured a certificate of authority so to do from the secretary of state."
   Section 351.570.2 provides, in pertinent part: "2. Without excluding other activities which may not constitute transacting business in this state, a foreign corporation shall not be considered to be transacting business in this state, for the purposes of this chapter, by reason of carrying on in this state any one or more of the following activities:
   (10) Conducting an isolated transaction completed within a period of thirty days and not in the course of a number of repeated transactions of like nature."

6. In view of our disposition of defendant's first point, we need not consider whether defendant

was required by Rule 55.27, V.A.M.R., to allege plaintiff's incapacity in its answer or via prior or contemporaneous motion in order to avoid being deemed to have waived that defense. Our understanding of the prohibition of § 351.635 against "maintaining" any suit or action in any court of this state leads us to suppose the necessity of post-answer opportunities to raise the issue of a foreign corporation's incapacity.

7. Plaintiff's vice president testified that during the eight years next preceding trial plaintiff held sales in Missouri whenever the opportunity arose.

8. We can assume that, as of this second motion to dismiss, plaintiff, for all its auction activity in this state, could no longer consider itself within the safe harbor of the isolated transaction exception, § 351.570.2(10).

gal action in this state after forfeiture of their certificate of authority."

■ Nowhere in *Luna* does it appear whether or not the dismissed counterclaim arose out of defendant's transaction of business in Missouri and for that reason the case is of limited utility in the instant setting. It is true that the penalty provisions of § 351.635 appear neither to admit of exception nor to presuppose a distinction between suits brought on causes of action arising within the state and those arising without. But we are of the opinion that where a particular cause of action arises is crucially relevant to the determination whether it may be sued upon in our courts by a foreign corporation not in compliance with our laws.

In *Republic Rubber Co. v. Adams*, 213 S.W. 80 (Mo.1919), the court observed that "in this case the defendant especially invoked R.S. 1909, § 3040 [a forerunner of § 351.635], which, among other things, provides that, if foreign corporations do business in this state without complying with section 3039, R.S. 1909 [requiring, inter alia, that a foreign corporation procure a license to do business in this state], then such foreign corporations cannot 'maintain any suit or action, either legal or equitable, in any of the courts of this state.' *Of course, this means suit or action pertaining to business done in Missouri.*" (Emphasis ours.) Albeit in the context of the case the emphasized statement was gratuitous, it nevertheless sheds light upon the scope of the prohibition contained in § 351.-635.

But we need not rest our determination of defendant's first point upon so slender a reed as dictum. Plaintiff's right to maintain the instant suit notwithstanding its noncompliance with § 351.570.1 can as easily be premised upon the fact that the transaction out of which such suit arose was in interstate commerce. In *Gutta Percha Mfg. & Rubber Co. v. Lehrack*, 214 S.W. 285 (Mo.App.1919), the court stated:

"... the fact that a company, as to other matters and transactions, may be doing business within the state in such manner as to require a license therefor, does not prevent the company from performing another perfectly valid transaction in interstate commerce which is not subject to state regulation. In other words, if the particular transaction involved herein was an interstate transaction and was not accomplished by the defendant as present and engaged in business within this state, then it should not be denied the right to enforce the contract with reference to such particular interstate transaction, even though it may be doing business as to other matters within the state and without a license. The right to sue is not taken away by the state statute for failure to have a license, but only the right to enforce contracts made in the doing of business subject and contrary to state regulation. *British American Portland Cement Co. v. Citizens' Gas Co.*, 255 Mo. 1, 32, 164 S.W. 468, Ann.Cas. 1915C, 151. Consequently the mere fact that a company without a license may have engaged in business within the state for which a license is required, is no reason for penalizing it with reference to interstate business for which no license is needed."

This principle was relied upon more recently in *Superior Concrete Accessories v. Kemper*, 284 S.W.2d 482 (Mo.1955), and *Newspaper Publishers, Inc. v. St. Charles Journal, Inc.*, 406 S.W.2d 801 (Mo.App. 1966).

■ That the transaction involved in this case before us is of an interstate character is beyond question. The auction was conducted in Texas by a Nebraska corporation and was attended by prospective buyers from various midwestern states. While it is true, as defendant points out, that the trailers were ultimately to come to rest within Missouri and that payment for them was to be made by and title therefor was to be transferred to a Missouri corporation, these circumstances do not alter the essentially interstate character of the transaction. To hold otherwise would require us to take a radically narrow view of what constitutes interstate commerce. This we

decline to do. Defendant's first point is denied.

In its second point defendant argues the trial court erred in adjudging it liable to plaintiff for the purchase price of the missing trailer because plaintiff failed to comply with the requirements of the Texas Certificate of Title Act, which failure, it is said, rendered the purported sale void ab initio and therefore precluded passage of the risk of loss of the missing trailer to defendant.

Section 33 of the Texas Certificate of Title Act (art. 6687–1 [Vernon's Ann.Civ. St.]) provides, inter alia, that "No motor vehicle may be disposed of at a subsequent sale unless the owner designated in the certificate of title transfers the certificate of title on a form prescribed by the [Highway] Department before a Notary Public." "Motor vehicle" is defined in § 2 to include semi-trailers of the type here involved. Section 53 provides that "All sales made in violation of this Act shall be void and no title shall pass until the provisions of this Act have been complied with."

We decline to mire ourselves unnecessarily in considering whether or not plaintiff complied with the Texas Certificate of Title Act. Rather, we opt to rely upon those cases holding that a sale not effected in compliance with that Act may nevertheless be valid as between the parties. In *Rush v. Smitherman*, 294 S.W.2d 873 (Tex.Civ. App.1956), the court was faced with the argument that failure to comply with the Certificate of Title Act rendered void the sale of a motor vehicle. The court first noted that § 1 of the Act declares the legislative intent to be " 'to lessen and prevent the theft of motor vehicles * * * and the importation into this State of, and traffic in, stolen motor vehicles * * * and the sale of encumbered motor vehicles * * * without the enforced disclosure to the purchaser of any and all liens for which any such motor vehicle * * * stands as security, and the provisions hereof, * * * are to be liberally construed to that end.' " The court continued, at 877: "Adhering to the declared purposes announced by Section 1 of

the law itself, and even in the face of the express statement of Sections 33 and 53, that all sales without the transfer of the certificate shall be void, many cases have recognized the validity of sales between the parties, though no transfer was made. . . . So, despite the failure to transfer the certificate and the Act's declaration that the non-transfer will render the sale void, as between the parties and when the purposes of the Act are not defeated, the sale is valid." This principle has been relied upon in numerous cases and in a variety of factual contexts. See, e.g., *Truck Insurance Exchange v. Schuenemann*, 391 S.W.2d 130 (Tex.Civ.App.1965); and *Viator v. American General Insurance Co.*, 411 S.W.2d 762 (Tex.Civ.App.1967).

█ Affording further insight into the particular issue at hand is *Hughes v. Al Green, Inc.*, 65 Ohio St.2d 110, 19 Ohio Op.3d 307, 418 N.E.2d 1355 (1981), which features an excellent discussion of the relationship between the requirements of a certificate of title act and location of risk of loss under the Uniform Commercial Code. Inasmuch as an understanding of this relationship greatly facilitates resolution of defendant's second point, we unabashedly undertake extensive quotation from *Hughes*, at pp. 1357–1358. The Ohio court first evaluated the effect of § 2–509 of the Uniform Commercial Code upon antecedent methods of determining who bears the risk of loss in particular situations:

"This provision represents a significant shift away from the prior importance of the concept of title in determining the point at which risk of loss passes from the seller to the buyer. Under the common law, not only did title to the contract goods determine risk of loss, but it also determined the issues of the buyer's right to the goods (through replevin), the seller's right to the purchase price, and the right to proceed against tortfeasors. Under the U.C.C., however, '[e]ach provision . . . with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title

to the goods except where the provision refers to such title.' R.C. 1302.42 (U.C.C. 2–401).

"Thus, as noted in Nordstrom, Sales, Section 130, at page 393:

" '[T]here is * * * one principle which applies to all risk of loss problems. This principle is summarized in one sentence from the Comments:

" ' "The underlying theory of these sections on risk of loss is the adoption of the contractual approach rather than an arbitrary shifting of the risk with the 'property' in the goods." '

" 'No longer is the question of title of any importance in determining whether a buyer or a seller bears the risk of loss. It is true that the person with title will also (and incidentally) often bear the risk that the goods may be destroyed or lost; *but the seller may have title and the buyer the risk,* or the seller may have the risk and the buyer the title. In short, title is not a relevant consideration in deciding whether the risk has shifted to the buyer.' (Emphasis added.)"

"Similarly, in 3A Bender's Uniform Commercial Code Service, Section 8.03, it is stated, at page 8–21, that U.C.C. 2–509 (R.C. 1302.53):

" ' * * * sets forth a contractual approach, as distinguished from the property concept of title, to solving the issues arising when goods are damaged or destroyed. The section focuses on specific acts, such as tender of delivery by the seller, or receipt of the goods or of documents representing the goods by the buyer. Title is relevant under this section only if the parties provide that risk of loss shall depend upon the location of title.' "

\* \* \* \* \* \*

"In the instant cause, the appellant-buyer had received possession of the automobile as partial execution of a merchant-seller's obligations under a purchase contract. Thus, unless other statutory provisions make R.C. 1302.53 [U.C.C. 2–509] inapplicable, the appellant, as a buyer in receipt of goods identified to a contract, must bear the loss of the car's value resulting from the collision.

"R.C. 1302.53 does not conflict with R.C. 4505.04 [the Certificate of Title Act]. The purpose of the Certificate of Title Act is to prevent the importation of stolen motor vehicles, to protect Ohio bonafide purchasers against thieves and wrongdoers, and to create an instrument evidencing title to, and ownership of, motor vehicles. (Citations omitted.) The Act was not adopted to clarify contractual rights and duties, as was R.C. Chapter 1302.

"As stated in *Grogan Chrysler-Plymouth, Inc. v. Gottfried* (1978), 59 Ohio App.2d 91, 94–95, 392 N.E.2d 1283:

" 'R.C. 4505.04 was intended to apply to litigation where the parties were rival claimants to title, i.e., ownership of the automobile; to contests between the alleged owner and lien claimants; to litigation between the owner holding the valid certificate of title and one holding a stolen, forged or otherwise invalidly issued certificate of title; and to similar situations.' (Citations omitted.)

"In cases decided prior to the adoption of the Uniform Commercial Code, the Certificate of Title Act was properly consulted in determining whether a buyer or seller bore the risk of loss or could proceed against third-party tortfeasors because determination of those issues was dependent, under the common law, upon a finding of *ownership.* With ownership no longer being determinative, R.C. 4505.04 is irrelevant to the issue of risk of loss, and thus does not conflict with a U.C.C. risk of loss analysis."

For a summary of two other cases reaching similar results, see Annot., Who Bears Risk of Loss of Goods Under UCC §§ 2–509, 2–510, 66 A.L.R.3d 145, 176 (1975). We deem the views expressed in these and the above summarized cases dispositive of defendant's second point, which we deny.

In its third and final point defendant forges a frontal assault upon the trial court's conclusion that the risk of loss of the missing trailer passed from plaintiff to

defendant. The court below proffered three distinct bases for its conclusion that defendant bore the risk of loss: (1) the parties agreed, as permitted by § 2.509(d) of the Texas Business and Commerce Code [U.C.C. § 2–509(4)], that defendant would bear the risk of loss after settlement; (2) defendant was a bailee of the trailer within the meaning of § 2.509(b)(2) [U.C.C. § 2–509(2)(b)] and therefore the risk of loss passed to defendant pursuant to that provision; and (3) per § 2.509(c) [U.C.C. § 2–509(3)], defendant assumed the risk of loss by taking possession of the trailer before it was discovered missing.

■ We note initially that our primary concern is the correctness of the result and not the route by which it is reached. Thus, the action of the court below will be affirmed if it is correct upon any theory. *Walker v. Walker*, 631 S.W.2d 68, 71[8] (Mo.App.1982); *Worlledge v. City of Greenwood*, 627 S.W.2d 328, 331[5] (Mo. App.1982).

The trial court applied principles of novation to the settlement scenario in order to reach the conclusion that plaintiff and defendant entered into an agreement concerning passage of the risk of loss. The court reasoned that when defendant's agent, Ray Eagleburger, took the place of high bidder Jack Watson in settling for the four trailers, a substitution of contract parties was effected which, in conjunction with other aspects of the transaction, amounted to a novation. Thus, defendant, through Eagleburger, became bound by the terms of the contract to which it became a party, one of which was that the buyer of a sale item assumes "full responsibility" for that item at the time it is sold.

■ We first consider whether the arrangement by which defendant became buyer of the four trailers constituted a novation. In order to constitute a valid contract of novation, there must be (1) a previous valid obligation which is (2) extinguished by a new valid contract, effected by substitution of parties or of undertaking; (3) with the consent of all the parties, the debtor, the creditor, and the third par-

ty, if any, all parties intending such result. 58 Am.Jur.2d, Novation, § 10, at p. 522. Assent to the terms of a novation need not be shown by express words, but may be inferred from the facts and circumstances attending the transaction and the conduct of the parties thereafter. 58 Am.Jur.2d, Novation, § 16, at p. 529. Further, a person substituted as a party to a contract who agrees to perform the original obligation becomes bound by all the terms of the contract to the same extent as the original party. 58 Am.Jur.2d, Novation, § 24, p. 538.

■ In considering whether there was a previous valid obligation, the first element of a novation, we refer to § 2.328(b), Texas Business and Commerce Code [U.C.C. § 2–328(2)], which provides that "A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner." This section, in specifying when a sale by auction "is complete," refers to when a contract binding both bidder and auctioneer (for seller) comes into being. 3A Bender's Uniform Commercial Code Service, § 8.03, fn. 30, p. 8–47. Thus, when the hammer fell following Jack Watson's high bid on the Hobbs trailer units, a contract binding him and plaintiff sprang into existence. This clearly suffices as a previous valid obligation for purposes of our analysis.

The second element of a novation is the extinguishment of the previous obligation by a new valid contract. As noted, this may be accomplished by substitution either of parties or of undertaking. We recall that after Ray Eagleburger and Bert Putman, as representatives of defendant, reached an agreement with Jack Watson whereby Watson would sell four of the five Hobbs trailer units to defendant, the three men went to plaintiff's settlement trailer to conclude the transaction with plaintiff. There, Eagleburger, on behalf of defendant, tendered plaintiff's settlement personnel a sight draft for $56,400, which amount represented the aggregate high bid price for four Hobbs trailers. Plaintiff's employee marked through Watson's bidding num-

ber on the auction memorandum and replaced it with Eagleburger's. As recounted, supra, this substitution of one bidding number for another was the only documentary evidence that Eagleburger, rather than Watson, had settled for the four trailers.

Faced with defendant's protestations concerning the formal sufficiency of this procedure to effect a substitution of parties as required for a novation, we turn for guidance to 58 Am.Jur.2d, Novation, § 9, p. 522:

"[A]n agreement whereby a new debtor is substituted for an old one, and the old obligation discharged, is not a mere promise by the new debtor to be responsible for the debt of his creditor and to pay it, but a promise by him to pay his own debt in that particular way. It is a promise founded on a new and sufficient consideration moving to the promisor from the debtor at the time the promise was made. Such a promise or agreement is an original undertaking not within the statute of frauds, and no note or memorandum in writing, expressing the consideration, and subscribed by the party to be charged therewith, is required."

Thus, the statute of frauds poses no obstacle to the more or less informal substitution of one obligor for another as in this case. It is interesting to note at this juncture that the informal procedure employed upon settlement seems conveniently to have sufficed with respect to the three trailers which did not disappear. For aught that appears, at no time during the transaction of business with plaintiff's settlement personnel did defendant's representatives balk at this procedure on the ground of formal insufficiency and we will not now entertain any *ex post facto* caterwauling to that effect.

The third requisite for a novation is that discharge of the valid existing obligation by substitution of a new valid obligation be accomplished with the consent of all parties and consistent with their intent. That there was a concurrence of intention among the participants in the transaction before us is beyond cavil. This much can be inferred not only from the circumstances attending the settlement proceedings—the replacement of Watson's bidding number with Eagleburger's and plaintiff's acceptance of the sight draft from Eagleburger as payment for the four trailers—but also from defendant's posture *vis a vis* that portion of the transaction as to which no complaint is here made. We cannot emphasize enough that defendant's status as buyer of the three trailers which were safely delivered to its Springfield plant arose via the few pen strokes and concomitant agreement which, at the time, were made with reference to all four trailers. Only in retrospect and due to the intervention of misfortune is defendant's view of the transaction altered.

Defendant contends that the language contained in the registration form and auction memorandum was "insufficient as a matter of law" to shift the risk of loss to defendant. We are referred to *Caudle v. Sherrard Motor Co.,* 525 S.W.2d 238 (Tex. Civ.App.1975), in which the court had occasion to consider the effect of a "contrary agreement" regarding risk of loss made pursuant to § 2.509(d). In *Caudle* the sales contract clause in question provided:

"No transfer, renewal, extension or assignment of this agreement or any interest hereunder, and no loss, damage or destruction of said motor vehicle shall release buyer from his obligation hereunder."

The court held this language insufficient to constitute a "contrary agreement" as provided for in § 2.509(d):

"A contract which shifts the risk of loss to the buyer before he receives the merchandise is so unusual that a seller who desires to achieve this result must clearly communicate his intent to the buyer. (Citations omitted.) This clause was apparently intended to fix responsibility for loss *after the defendant had taken possession* of the trailer. This interpretation is consistent with other provisions of the contract.... We ... conclude that it was not the intention of the parties to transfer risk of loss of the trailer *prior to delivery of possession to the buyer*

. . . If parties intend to shift the burden of the risk of loss from the seller to the buyer before delivery of the goods, then such must be done in clear and unequivocal language." 525 S.W.2d at 241.

It thus appears that the *Caudle* court's primary concern was that a risk-shifting clause in a sales contract unambiguously fix the time of its operation, especially where the seller intends to shift the risk of loss to the buyer prior to the latter's receipt of possession of the goods. We recall that the third of seven "Terms of Sale" printed on the registration form provided that "The undersigned takes full responsibility for any item purchased *at the time it is sold*" and that the avowals printed on the auction memorandum included the statement that "The undersigned buyer warrants . . . that he will take full responsibility for the item *at the time of purchase* including full liability and property damage insurance coverage." (Emphasis ours.) Unlike the clause involved in *Caudle*, the provisions at issue herein indicate clearly that the buyer's assumption of "full responsibility" for an item occurs at the time it is sold. As far as defendant was concerned, sale of the trailers occurred when Ray Eagleburger replaced Jack Watson in settling for them shortly following the latter's high bid.

Defendant argues that "[t]he requirement that the buyer assume 'full responsibility' for any item at the time of purchase could, to the layman, easily mean any number of things besides a transfer of the risk of loss. It might imply, for example, that the purchaser is responsible for picking up and transporting the vehicles purchased. It might also imply that the purchaser is responsible for titling, licensing, and paying applicable sales or use taxes on any vehicle purchased."

■■■ We respond to these hypotheses by expressing our opinion that the "full responsibility" language enunciated with sufficient clarity plaintiff's intention to shift the risk of loss to defendant at the time of sale. As an aside, we note that no further "paperwork" followed that done in the settlement trailer. Thus, defendant's agent proceeded to transport the trailers to Springfield with no documentary authorization to do so other than that which defendant now claims was insufficient to shift the risk of loss. Accepting *arguendo* defendant's contention that neither of the other alternative bases for the trial court's risk of loss determination is defensible, we hypothesize application of the only remaining provision of § 2.509 conceivably applicable to the instant facts, § 2.509(c): "otherwise, the risk of loss passes to the buyer on tender of delivery." Section 2.503(a) [U.C.C. § 2–503(1)] states: "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." We refer to the testimony of Ray Eagleburger, who indicated he knew of no reason why defendant could not have removed the four trailers from the sale site immediately after settlement and that he knew defendant had a right to take them as of that time. This, considered in light of plaintiff's *laissez faire* position with respect to the trailers post-settlement, convinces us that a tender of delivery within the meaning of § 2.503(a) occurred. Thus, even were we to conclude that the "full responsibility" clauses on the registration form and auction memorandum did not express clearly enough plaintiff's intention to place the risk of loss upon defendant prior to delivery, defendant would, per § 2.509(c), yet be held to have borne that risk.

■■■ We next consider what can only be regarded as something of a buzzer shot from half-court. Defendant asserts that Ray Eagleburger did not know he was signing a contract when he completed the registration form and that none of plaintiff's personnel pointed out the "fine print" terms of sale or explained them to him. We find no basis for concluding that the "bargaining position" of defendant, through Eagleburger, was, relative to that of plaintiff, such as to warrant invocation of equitable principles applicable to so-called adhesion contracts. A party in an

armslength transaction is charged with the obligation of reading what he signs and, in the absence of a showing of trickery or artifice, he cannot avoid the consequences of the instrument he signs on the ground that he did not know what he was signing. *Farina v. Calvary Hill Cemetery,* 566 S.W.2d 650, 652[2] (Tex.Civ.App.1978). Thus, we will not countenance any complaint premised on the naivete of defendant's representative, who, the evidence reveals, had on a prior occasion not only attended but purchased a vehicle at an auction conducted by plaintiff at which the same procedures were employed.

■ Turning down the final corridor in defendant's labyrinth of argument we are greeted with the bare observation that plaintiff did not fully comply with its own auction memorandum terms in that it failed to require defendant to tender payment "in American currency or bank certified funds or the equivalent." What effect this "noncompliance" should be deemed to have upon the validity of the transaction is presumably left to our collective imagination, as defendant proffers no conclusion on that score. In any event, the clause alluded to would have operated to plaintiff's benefit and, as prospective beneficiary of this contract term, plaintiff was free to waive compliance with it. *Campbell v. Richards,* 352 Mo. 272, 176 S.W.2d 504 (1944); *Nelson v. Cannon,* 126 Ariz. 381, 616 P.2d 56 (App. 1980).

Defendant's multi-faceted final point is denied and the judgment affirmed.

FLANIGAN, P.J., and GREENE and CROW, JJ., concur.