Andrew J. ORTBALS, et al., Appellants,

v.

DIRECTOR OF REVENUE, Respondent.

No. 75569.

Supreme Court of Missouri,
En Banc.

Dec. 21, 1993.

As modified Jan. 25, 1994.

Sidney Willens, Kansas City, for appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gretchen G. Hunter, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

Andrew J. & Susan W. Ortbals, husband and wife, claim that the Director of Revenue owes them a refund for overpayment of sales tax assessed on the purchase of a new 1991 Pontiac Sunbird convertible. The Director denied the claim after which the Ortbals filed a complaint with the Administrative Hearing Commission (AHC). The case proceeded on a stipulated record, both parties having waived their right to an evidentiary hearing. The AHC also denied the claim for a refund, and the Ortbals now seek review of that decision. Because resolution of the refund question requires construction of *§ 144.070, RSMo 1986*, a revenue statute, this Court has jurisdiction. *Mo. Const. art. V, sec. 3.* The decision of the AHC is affirmed.

Appellate review is governed by *§ 621.193, RSMo 1986*, which provides in pertinent part: "the decision of the administrative hearing commission shall be upheld when authorized

by law and supported by competent and substantial evidence upon the whole record...."

The AHC entered detailed findings of fact that are consistent with the record. A summary of those facts follows:

On November 8, 1991, the Ortbals negotiated the purchase of a new Pontiac convertible from Christopher Pontiac, Inc., a car dealership in Kansas City. Susan's father, Sidney L. Willens, an attorney, accompanied the couple to assist them in negotiating a price for the car. Willens instructed the Christopher salesman to reach a "bottom line" price of $15,000 however he could, and after more discussion, the parties did indeed agree on that price. In addition, the parties agreed that the Ortbals would trade in their 1984 Mercury Marquis for a $1,450 credit against the $15,000 price.

Following the discussion in the showroom, Susan and her father met with the salesman in his office to finalize the deal. The salesman gave Susan various documents to sign, including a purchase agreement and an application for incentive allowance. Susan asked her father if she needed to read all of the documents before signing them, and in response, he requested that the salesman "repeat the 'numbers' agreed upon." The salesman stated: "The bottom line is you'll give me a check for $13,550 and title to the Mercury." Susan then signed all of the documents without reading any of them, and copies were given to Susan's father. Immediately thereafter, Susan signed over title to the Mercury and wrote a personal check payable to Christopher Pontiac in the amount of $13,550, the difference between the $15,000 price and the $1,450 credit for the Mercury Marquis. The Ortbals then took possession of the new car.

The purchase agreement signed by Susan just prior to her payment provided that the purchase price of the convertible was $17,202, less a trade-in allowance of $2,852, for a net price of $14,350. The agreement also showed $800 as "Total Cash Down" and $13,550 as the "Unpaid Cash Balance." The application for incentive allowance requested payment of an unspecified amount of money from the manufacturer, General Motors, to the purchaser. That same document includes a form, signed by the Ortbals, assigning the incentive allowance to the dealer. The $800 listed on the purchase agreement as "Total Cash Down" was the incentive allowance assigned by the Ortbals.

Shortly after the purchase of the convertible, the Ortbals received a Missouri title application prepared by Christopher Pontiac that tracked the terms of the purchase agreement: the total price was $17,202, the trade-in allowance was $2,852, and the net price was $14,350. However, the application stated, in error, that Mercantile Bank of St. Louis held a lien on the car. In fact, there was no lien; the Ortbals had paid the full purchase price at the time of delivery. The Ortbals returned this application to Christopher Pontiac.

Christopher Pontiac then sent the Ortbals a second application which deleted reference to a lien, and also reduced the amount of the incentive allowance by $300, from $800 to $500, thereby reducing the net price to $14,050. The trade-in allowance was correspondingly increased by $300 from $2,852 to $3,152. The record does not disclose the reason for this $300 adjustment, but it appears that $500 instead of $800 was inserted in the application for incentive allowance as the amount of the allowance. In any event, both Susan and Andrew signed the corrected title application under the statement providing, "I certify that the facts herein are true to the best of my knowledge."

On December 23, 1991, the Ortbals submitted the corrected application to the Director of Revenue who assessed $593.61 in state sales tax and $316.13 in local tax computed on the net price of $14,050. Upon payment of the taxes, the Director issued title. Then, on February 25, 1992, the Ortbals filed a request with the Director of Revenue for a refund of $32.38. That figure represents the amount of the state and local taxes computed on the $500 manufacturer's incentive allowance added to Susan's payment of $13,550 to reach the net price of $14,050. As grounds for the refund request, Susan asserted that the "true price of the convertible was $13,550, not $14,050, and that the dealer had deceived her by inflating the purchase price

and by having her sign the application for incentive allowance without indicating a specified allowance."

On appeal, the Ortbals contend that the AHC erred in finding that the $500 was an "incentive allowance" or "rebate" assigned to the dealer and added to the purchase price, rather than finding that the $500 was a price reduction to the buyer. To determine the nature of the $500 payment and its effect, if any, on the purchase price, we must review the pertinent sales tax statutes. *Section 144.070.2* specifically defines the "purchase price" of a motor vehicle as: "... the total amount of the contract price agreed upon between the seller and the applicant in the acquisition of the motor vehicle ... regardless of the medium of payment therefor." Under *§ 144.025.1, RSMo 1986*, any trade-in allowance is not included in the agreed-on purchase price.

■ In this case, it is uncontested that the total amount paid to the dealer was $14,050—a $13,550 cash payment by the Ortbals and an additional $500 by way of the assignment of the rebate or manufacturer's incentive allowance by the Ortbals to the dealer. By signing the application for title, the Ortbals certified that $14,050 was the "agreed upon" purchase price of the automobile. The fact that part of the purchase price is paid through the medium of a rebate or manufacturer's incentive allowance, as opposed to cash, is legally irrelevant. The inclusion of the phrase, "regardless of the medium of payment therefor," in *§ 144.070.2's* definition of "purchase price" encompasses any form of payment used to satisfy the contract price. Ortbals correctly states that a rebate from a manufacturer paid to a purchaser reduces the purchaser's net cost, but that rebate does not reduce the purchase price between the purchaser and the dealer. We hold, therefore, that the $500 assignment was not a reduction in the purchase price.

The Ortbals' two remaining claims are:

(1) that the assignment of the incentive allowance to the dealer was invalid because the application did not specify the amount of the allowance, and further, that the addition of the amount of the incentive allowance was a fraudulent and material alteration, and

(2) that the AHC improperly invoked the parol evidence rule to preclude evidence of the true agreement between the parties that the purchase price of the automobile was $13,550. Both points are interrelated, and are sub-issues of an overriding claim that the payments made to the seller and the purchase price listed on the various documents were the product of fraudulent conduct by the dealer.

■ To determine the purchase price of the vehicle, the AHC reviewed several documents including the purchase contract and purchase order, the application for incentive allowance and assignment, and the title application. In response to the Ortbals' claim that these documents misrepresent the transaction, the AHC applied the parol evidence rule. The AHC correctly cited *Norden v. Friedman,* 756 S.W.2d 158, 163 (Mo. banc 1988), noting that the parol evidence rule "precludes oral evidence to contradict the terms of an unambiguous and complete written instrument absent fraud, common mistake, accident, or erroneous omission." Using these criteria, the AHC found that the documents in question were "complete and unambiguous" and that the Ortbals did not show fraud, common mistake, accident, or omission. Evidence that the purchase price was only $13,550 was therefore excluded.

The fraud occurred, according to the Ortbals, when the salesman induced them to sign the purchase contract by stating, in response to Mr. Willens' request to "repeat the numbers," that "the bottom line is you'll give me a check for $13,550 and title to the Mercury." The alleged fraud continued when the salesman failed to explain the application for incentive allowance, and in particular, that the amount of the incentive allowance, undisclosed on the application form, would be paid to the dealer and added to the purchase price. The Ortbals contend that this evidence was sufficient to trigger the "fraud" exception to the parol evidence rule.

Critical to the AHC's determination that there was no fraud is the fact that the purchase price was not concealed but was specifically stated in both the purchase agreement and title application. The Ortbals need only

438 ◼

have read these provisions. The Court of Appeals in *Taylor and Martin, Inc. v. Hiland Dairy, Inc.,* 676 S.W.2d 859, 871–72 (Mo.App.1984), stated:

[a] party in an arm's length transaction is charged with the obligation of reading what he signs and, in the absence of a showing of trickery or artifice, he cannot avoid the consequences of the instrument he signs on the ground that he did not know what he was signing.

*See also Sanger v. Yellow Cab Co.,* 486 S.W.2d 477, 481 (Mo. banc 1972); *Mercantile Trust Co. v. Carp,* 648 S.W.2d 920, 924 (Mo. App.1983). Given that the Ortbals were assisted in the negotiations by Mr. Willens, an attorney, they are hard pressed to contend that they were induced by trickery or artifice to sign the documents without reading them. Moreover, the salesman's statement of the "bottom line" of $13,550 was not inconsistent with the terms of the purchase order and title application. The salesman did not state that the purchase price was $13,550, just that the "bottom line"—the net payment by the Ortbals—was that amount.

Similarly, we find no fraud or trickery in the request to sign the application for incentive allowance in blank. The Ortbals, again assisted by their lawyer, knew, or should have known, from the face of the document, that an incentive allowance or rebate of some amount was to be paid to the dealer. In other words, there was no failure to disclose the existence of an incentive allowance but only the amount of that allowance. Furthermore, as noted earlier, the Ortbals do not suggest that the amount of the rebate was other than $500.

Based on the record before us, the AHC did not err in applying the parol evidence rule. The only admissible evidence of the purchase price was that contained in the purchase contract and title application, and the Ortbals, having the burden of proof, § 621.050.2, RSMo Supp.1992, have failed to establish that the purchase price was other than $14,050. Accordingly, we hold that the decision of the AHC is authorized by law and supported by competent and substantial evi-dence upon the whole record. The decision is affirmed.

All concur.